In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2879

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ARCADIO HERNANDEZ,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11-CR-00360 — **Samuel Der-Yeghiayan**, *Judge.*

ARGUED APRIL 2, 2014 — DECIDED MAY 7, 2014

Before EASTERBROOK, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* Arcadio Hernandez was convicted
by a jury of possessing a gun as a felon. He had confessed to
knowingly possessing a gun, and the jury was so told over his
objection. He argues that his confession should have been
suppressed because it was obtained by a two-step interrogation
process that circumvented *Miranda*. The district court dis-
agreed, finding that the "interrogation" that took place before
he was given *Miranda* warnings did not circumvent *Miranda*

under the Supreme Court's jurisprudence. We affirm, but on the alternative basis that the single question asked before Hernandez was given *Miranda* warnings falls within the "public safety" exception to *Miranda*.

## I. Background

Arcadio Hernandez picked up a red bag from beside a garbage can in an alley. Chicago Police Officers Anthony Varchetto and Lenny Pierri, who were patrolling in an unmarked car, saw him pick up the red bag and run north up the alley before exiting the alley and turning left towards a nearby avenue. There, he saw the officers and, realizing he had been observed, dropped the red bag on the ground beside him. As the officers approached him, he volunteered, "I just have some dope,"[1] and he handed a key holder to Officer Varchetto. Looking inside, Officer Varchetto found five small bags of what appeared to be (and was later determined to be) heroin. The officers arrested Hernandez, and then Officer Pierri asked him what was in the red bag that he had dropped on the ground beside him. Hernandez replied that he had "ripped the guys around the corner for dope and a gun." After hearing that, Officer Pierri opened the bag and found a loaded .38 caliber gun, 61 small bags of crack cocaine, and 55 small bags of marijuana. At that point, the officers gave Hernandez *Miranda* warnings, put him in the patrol car, and took him back to the station.

---

[1] Apparently, "dope" can mean either marijuana or heroin, depending on the context. *Dope Definition*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/dope (last visited Apr. 23, 2014).

During the ride to the station, without being prompted, Hernandez volunteered more details of the red bag caper. He let the officers know that he had received fake drugs from some dealers and was beaten when he complained. The red bag had belonged to those dealers and taking it was his way of retaliating. At the station, Hernandez was again given his *Miranda* warnings and he repeated the same story with more detail. The story was essentially a confession since he admitted that he knew there was a gun in the bag when he took possession of it.

Before trial, Hernandez moved to suppress his post-*Miranda* confession on the ground that it was a product of having confessed during a pre-*Miranda* interrogation. The district court carefully considered the Supreme Court's rulings in *Oregon v. Elstad*, 470 U.S. 298 (1985) and *Missouri v. Seibert*, 542 U.S. 600 (2004) as well as Seventh Circuit cases interpreting and applying *Seibert*. Under this court's interpretation of *Seibert*, the district court must first determine whether the officers deliberately circumvented *Miranda*. If not, the voluntariness standard of *Elstad* applies; if so, the district court must look at the *Seibert* plurality's factors and Justice Kennedy's "curative steps" to determine whether the taint of the pre-warning interrogation has been sufficiently removed for *Miranda* warnings given "midstream" to have been effective.[2]

---

[2] There was only a single pre-warning question, so to call the *Miranda* warnings here "*mid*stream" is imprecise. But it is the term-of-art. The point is, the question asked of Hernandez while he was in custody is one which—absent certain circumstances—would require *Miranda* warnings,

(continued...)

*See United States v. Stewart*, 388 F.3d 1079, 1090 (7th Cir. 2004). The district court found that the officers did not deliberately circumvent *Miranda* and that both Hernandez's pre- and post-warning statements and confessions were voluntary. Accordingly, it admitted Hernandez's post-warning confession. Hernandez appeals.

## II. Discussion

If officers were allowed to interrogate a suspect until he confesses and *then* warn him of his rights and get him to re-confess, *Miranda*'s prophylactic rule would be undermined. This is the tactic targeted for eradication by *Seibert*. On appeal, Hernandez argues that the court erred in finding that the officers did not deliberately use a pre-warning interrogation to undermine *Miranda* and, therefore, that the court erred in holding that *Seibert* did not bar his post-warning confession. But if all the pre-warning questions fall within an exception to *Miranda*, the questions do not undermine *Miranda*'s rule, so *Seibert* is not triggered.[3] Officers do not violate *Miranda* by asking a "routine booking question," *Pennsylvania v. Muniz*, 496 U.S. 582, 601–02 (1990), or "questions necessary to secure

---

[2] (...continued)
but they were not given until after it was asked. However, as we later conclude, "certain circumstances" were present.

[3] And similarly, such questions are far less likely to have been part of the "deliberate use of a two-step interrogation strategy" to circumvent *Miranda*. *Stewart*, 388 F.3d at 1090. But we need not even reach that question if *Miranda* is not violated in the first instance.

their own safety or the safety of the public." *New York v. Quarles*, 467 U.S. 649, 659 (1984).

The latter, to which we turn our focus, is often called the "public safety" exception. In crafting this exception, the Supreme Court gave us two guideposts. First, in *Quarles*, officers "in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket," to which the exception applied to asking where the gun was. *Quarles*, 467 U.S. at 657. And second, the facts of *Orozco v. Texas*, 394 U.S. 324 (1969)—where officers, who had burst into a suspect's bedroom four hours after a murder, "began vigorously to interrogate him about whether he had been present at the scene of the shooting and whether he owned a gun," which violated *Miranda*. *Quarles*, 467 U.S. at 659 n.8 (discussing the facts of *Orozco* and noting that it was "in no sense inconsistent" with *Quarles*). "The exception … [is] circumscribed by the exigency which justifies it." *Id.* at 658. And the parsing principle is that "questions necessary to secure [the officer's] own safety or the safety of the public" are permissible "and questions designed solely to elicit testimonial evidence from a suspect" are not. *Id.* at 659.

Applying *Quarles*, some slight variations have developed among the circuits which one commentator has suggested fall generally into two groups—a "broad approach" where questions designed to protect officers in inherently dangerous situations are permitted and a "narrow approach" where only questions stemming from actual evidence that a suspect or

others could inflict immediate harm to officers or the public are permitted. *See* Rorie A. Norton, Note, *Matters of Public Safety and the Current Quarrel over the Scope of the* Quarles *Exception to Miranda*, 78 Fordham L. Rev. 1931, 1948 (2010) (grouping the First, Eighth, and Ninth Circuits into the broad group and the Second, Fourth, Fifth, Sixth, and Tenth Circuits into the narrow group).

These nuances among the circuits produce one common practical distinction. If there is a perceived risk that, when searching a vehicle or a residence, the officer might inadvertently bump or otherwise mishandle a hidden firearm (or other dangerous object) the broad approach would permit the officer to first ask whether any such danger is present. The narrow approach would not. *Compare United States v. Liddell*, 517 F.3d 1007, 1008 (8th Cir. 2008) (asking "is there anything else in there we need to know about?" "That's gonna hurt us?" while searching secured suspect's vehicle fell within the exception) *with United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007) (requiring, as the second part of a formal two-prong test, "that someone *other than police* might gain access to that weapon and inflict harm with it." (emphasis added)). This circuit has cited the Eight Circuit's approach approvingly, *United States v. Are*, 590 F.3d 499, 506 (7th Cir. 2009) (citing *United States v. Williams*, 181 F.3d 945, 953–54 (8th Cir. 1999)), but we have not had to decide whether we agreed entirely, because in *Are* there was a risk of the suspect or others who were there obtaining any weapon that was hidden on the premises. *Id.* at 506.

But, even among circuits that otherwise take a narrow approach, questions designed to prevent officers from hurting themselves during a search of the suspect's person are permitted. *See, e.g., United States v. Webster*, 162 F.3d 308, 332 (5th Cir. 1998) (holding, under a narrower view, that asking whether the suspect "had any needles in his pockets that could injure them during their pat down" fell within the exception); *United States v. Young*, 58 F. App'x 980, 981 (4th Cir. 2003) (unpublished) (same with regard to the question "Do you have any sharp objects, knives, needles, or guns."). This type of question is logical and important to permit. While firearms on a suspect's person or in close proximity to him can be lunged for and used to harm an officer, sharp and bio-hazardous objects pose a great risk to officers regardless of any action by the suspect. Accordingly, a search of his person and items in close proximity is necessary, and a question about what an item on his person contains is a narrow, practical way of ensuring officer safety during the immediate and inevitable search of the item. This is true whether the item is the clothes the suspect is wearing or something that he is carrying—especially when there are circumstances that suggest the possible presence of a hazard. A question about what such an item contains is "circumscribed by the exigency which justifies it," *Quarles*, 467 U.S. at 658, and "necessary to secure [the officer's] own safety." *Id.* at 659.

Whatever was in the red bag had prompted its owner to put it by a garbage can in an alley, had prompted Hernandez to run when he had it, and had prompted him to drop it when he saw police officers. Hernandez had already turned over what appeared to be heroin to the officers—a drug often

administered by a (sometimes used) syringe and, therefore, associated with blood-borne disease. *See United States v. Carrillo*, 16 F.3d 1046, 1049 (9th Cir. 1994) (stating that "the danger of transmission of disease or contact with harmful substances is real and serious enough").[4] Further, "drug dealers are known to arm themselves" so the officers could have reasonably suspected a firearm might be in the bag. *See United States v. Are*, 590 F.3d at 506 (citing *United States v. Edwards*, 885 F.2d 377, 384 (7th Cir. 1989)). Thus, the officers could not ignore it, *see Quarles*, 467 U.S. at 657 (firearm left unattended was a public safety concern), but grabbing or opening the red bag would place the officers at risk of harm (impalement on a heroin needle or bumping a loaded gun). *See Carrillo*, 16 F.3d at 1049 (holding that asking a suspect whether he "had any drugs or needles on his person" was within the public safety exception because "the danger of transmission of

---

[4] *See also* National Institute on Drug Abuse, *Research Report Series - Heroin* (2014), available at http://www.drugabuse.gov/sites/default/files/rrheroin-14.pdf ("Heroin use increases the risk of being exposed to HIV, viral hepatitis, and other infectious agents through contact with infected blood or body fluids (e.g., semen, saliva) that results from the sharing of syringes and injection paraphernalia that have been used by infected individuals…. Injection drug users (IDUs) are the highest-risk group for acquiring hepatitis C (HCV) infection and continue to drive the escalating HCV epidemic: Each IDU infected with HCV is likely to infect 20 other people. Of the 17,000 new HCV infections occurring in the United States in 2010, over half (53 percent) were among IDUs. Hepatitis B (HBV) infection in IDUs was reported to be as high as 20 percent in the United States in 2010, which is particularly disheartening since an effective vaccine that protects against HBV infection is available. There is currently no vaccine available to protect against HCV infection.").

disease or contact with harmful substances is real and serious enough; a pressing need for haste is not essential."); *see also United States v. McDaniel*, 182 F.3d 923 at *3 (7th Cir. 1999) (unpublished table decision) ("The need to determine whether McDaniel was armed or carrying potentially harmful drug paraphernalia falls squarely within the *Quarles* exception."). That the officers did not articulate these concerns is no matter; the public safety exception applies based on objective facts, not subjective motivations. *See Quarles*, 467 U.S. at 655–56. Accordingly, Officer Pierri's question about what the red bag contained was within the public safety exception to *Miranda*.

### III. Conclusion

Because Officer Pierri's asking what was in the red bag falls within the public safety exception, it does not violate *Miranda*. Accordingly, it cannot form the basis of a *Seibert* challenge to Hernandez's later confession. For that reason, we AFFIRM the judgment of the district court.