In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1767

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BRIAN DUTCHER,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:15-cr-00096-wmc — **William M. Conley**, *Chief Judge.*

ARGUED SEPTEMBER 29, 2016 — DECIDED MARCH 22, 2017

Before WOOD, *Chief Judge*, and RIPPLE and WILLIAMS, *Circuit Judges*.

WOOD, *Chief Judge*. On June 30, 2015, Brian Dutcher announced on Facebook that he planned to assassinate President Obama. He then drove to La Crosse, Wisconsin, where the President was scheduled to speak on July 2. Once in La Crosse, Dutcher repeated his plan to several people: a security guard, the police, the Secret Service, a nurse, a doctor, and (again) the police and Secret Service together. No one was

amused: Dutcher was charged with and convicted of two counts of threatening the President in violation of 18 U.S.C. § 871(a). On appeal, Dutcher complains about the sufficiency of the evidence and certain instructions the district court gave to the jury. We find no error, and so we affirm.

**I**

We evaluate a challenge to the sufficiency of the evidence *de novo*, construing the evidence "in the light most favorable to the government and ask[ing] whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Love*, 706 F.3d 832, 837 (7th Cir. 2013). We also take a fresh look at the question whether a disputed jury instruction fairly and accurately states the law; we will "reverse only if the instructions, taken as a whole, misled the jury." *United States v. Lawrence*, 788 F.3d 234, 245 (7th Cir. 2015).

President Obama was scheduled to give a speech at the University of Wisconsin–La Crosse on Thursday, July 2, 2015. On Tuesday, Dutcher posted this on his Facebook page: "thats [*sic*] it! Thursday I will be in La Crosse. hopefully I will get a clear shot at the pretend president. killing him is our CONSTITUTIONAL DUTY!" Later posts reprised the theme. In one, Dutcher added that "I have been praying on [*sic*] going to D.C. for 3 months and now the usurper is coming HERE. … pray for me to succeed in my mission." The next morning (Wednesday) Dutcher carried out the first part of his plan— he drove the 45 miles from Tomah, where he lived, to La Crosse.

Things went downhill from there. Dutcher stopped by the La Crosse Public Library, where his acquaintance Travis Good

worked as a security guard. Dutcher greeted Good and told him "I'm here to kill the President, the usurper, tomorrow at his speech." When Good replied that such statements were illegal, Dutcher simply said "[w]atch me" and walked off. Good alerted his supervisor, who passed the word along to the police, who dispatched two investigators. The investigators found Dutcher nearby in his van and, after he confirmed his threat, they asked him to come to the station for Secret Service questioning. Dutcher agreed, exhibiting a demeanor one of the investigators would later recall as "mellow."

The description was apt. During his two-hour interview with the Secret Service, a remarkably candid Dutcher claimed that it was his biblical and constitutional duty to assassinate the President, boasted that he could kill a person with a slingshot (one was later found in his van, though Dutcher had no other weapons), informed the agents that he had also made threats on Facebook, and consented to a search of his account. After the interview Dutcher was detained overnight at a hospital for a mental health evaluation. See Wis. Stat. § 51.15. There he reiterated his violent intentions to both a nurse and a doctor. And he was not done yet. Dutcher was arrested the next day and repeated his threats during the ensuing interview. Despite all this, he was found competent for pretrial release—a finding he does not challenge on appeal.

Based on the initial Facebook post and the statement to Good, a grand jury indicted Dutcher on two counts of knowingly and willfully threatening the President in violation of 18 U.S.C. § 871(a). After a two-day trial, the district court instructed the jury, in relevant part, that it could find willfulness if the government proved Dutcher "either actually intended his statement to be a true threat, or that he knew that other

people reasonably would view his statement as a true threat but he made the statement anyway." The jury found Dutcher guilty of both counts, and the district judge sentenced him to 36 months' imprisonment and three years of supervised release.

## II

Section 871(a) criminalizes "knowingly and willfully" making "any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States." The charged statement must be a "true threat," which has been defined for First Amendment purposes as "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). In *United States v. Fuller*, 387 F.3d 643, 646 (7th Cir. 2004), we held that a "true threat" for purposes of section 871(a) is defined objectively. A communication, we wrote, "is a 'true threat' if a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President." *Id.* (internal quotation marks omitted). Addressing a different statute, 18 U.S.C. § 875(c), which criminalized the transmission of any threat to kidnap or injure another, the Supreme Court held that the speaker must know that his communication contains a threat. *Elonis v. United States*, 135 S. Ct. 2001, 2009–11 (2015).

A true threat does not require that the speaker intend to carry it out, or even that she have the capacity to do so. *Black*, 538 U.S. at 360 (First Amendment); *United States v. Parr*, 545 F.3d 491, 498 (7th Cir. 2008) (18 U.S.C. § 2332a, prohibiting a threat to use a weapon of mass destruction against a federal

government building). The prohibition against threats protects against the fear they engender as well as the risk that they may be carried out. *Black*, 538 U.S. at 360. Still, the scope of a true threat is ultimately quite circumscribed. Section 871(a) does not criminalize offensive jokes or political hyperbole—bad taste, in other words, is not a crime. *Watts v. United States*, 394 U.S. 705, 707–08 (1969); *Fuller*, 387 F.3d at 647.

A

Dutcher insists that he was obviously unable to carry out his threats, and so they could have been nothing more than overheated rhetoric. He was certainly not trying to hide anything, and it is also undisputed that he had no ticket to the President's speech and was armed only with a slingshot (albeit a high-powered Wrist Rocket). But the significance of these facts was for the jury, not appellate review. More broadly, Dutcher is missing the point. He was charged with *threatening* the President under § 871(a), not with the separate crime of attempting to assassinate him under 18 U.S.C. § 1751. His lack of capacity is relevant only insofar as it suggests that his threats were not genuine. Dutcher's emphasis on his chance of success also overlooks the fact that § 871(a) permits conviction for threats to "inflict bodily harm upon the President." Dutcher told investigators that he used his slingshot to hunt small animals, and (actually comparing himself to David) that he could kill a man with it. The jury was entitled, based on this evidence, to find that Dutcher was capable of injuring the President with his slingshot, and it could have convicted him on that basis.

Dutcher also suggests that no one took his statements seriously, and that this indicates that he did not intend them to be true threats. Security camera footage of Good's unruffled

response to Dutcher's remarks supports this view—Good remains calm throughout the interaction and even wraps up a bit of computer work before heading off to report the incident. Yet the operative word in that sentence is "report." Calm or otherwise, Good took Dutcher seriously enough that he reported him around 30 seconds after their interaction. Moreover, his description was evidently alarming enough to cause his supervisor to contact the police. A reasonable juror could conclude Dutcher knowingly and willfully made a true threat.

Dutcher's contention that his Facebook post was not taken seriously since nobody who saw it informed the police (in fact, he got two "likes") also falls short of undermining the jury's conclusion. Granted, his case is a bit different from *Elonis*, the Supreme Court's most recent word on true threats. Elonis's Facebook posts frightened their targets enough to prompt them to contact the authorities. *Elonis*, 135 S. Ct. at 2005–06. Nothing in *Elonis*, however, excludes the possibility of an unreported true threat. Other evidence indicates that some of Dutcher's readers took him seriously. Gregory Remen, for one, responded to the charged post by encouraging Dutcher to "[t]ry voting" and asked "how will killing the pres change anything then??" The apprehensive response to Dutcher's follow-up posts underscores the point—one reader urged him to "Stay calm my friend. Please!" The jury was entitled to rely on these responses, along with Dutcher's later behavior, to find that the threats were genuine.

B

The jury instructions said that Dutcher acted "willfully" if he "either actually intended his statement to be a true threat, or that he knew that other people reasonably would view his

statement as a true threat but he made the statement anyway." Dutcher reads the latter clause to allow the jury to find willfulness so long as he made a statement "that other people reasonably would view … as a true threat"—that is, if it found only objective willfulness, without the subjective willfulness required by the statute under consideration in *Elonis*. But this argument overlooks the fact that the language he highlights was prefaced with the words "that he knew." The instructions did not permit the jury to find willful behavior simply because a listener "reasonably would view" Dutcher's statement as a threat. Instead, it had to find that he made the statement despite *knowing*, subjectively, that the listener would see it that way. This is consistent with *Elonis*.

The worst we can say about the instruction is that the court might have given Dutcher an unwarranted break when it used the term "reasonably." As worded, the instruction indicated that Dutcher not only had to know that his listener would take his statement as a true threat, but also that the listener's understanding was reasonable. Consequently, if Dutcher knew that a hypersensitive listener would unreasonably see his statement as a threat, there could be no willfulness. In any event, we review jury instructions as a whole; so long as "the instructions treat the issues fairly and accurately, they will not be disturbed upon appeal." *United States v. Coté*, 504 F.3d 682, 687 (7th Cir. 2007) (citation omitted). Dutcher's defense at trial was that his statements were political hyperbole, not credible threats. The instructions fully conveyed that point to the jury. Elsewhere, in language Dutcher does not challenge, they defined a "true threat" as "a serious expression of an intent to commit an act of unlawful violence," and they distinguished such statements from "[i]dle or careless

talk, political hyperbole or something said in a careless or jok-
ing manner … ." This was more than enough to present
Dutcher's theory of defense to the jury.

Dutcher urges in the alternate that § 871(a)'s *mens rea* of
"knowingly and willfully" requires a defendant to know that
her conduct is illegal. There is force to the argument that when
a statute uses *both* terms, it is asking for something more than
either term would require on its own. Thus, in *United States v.
Bates*, 96 F.3d 964, 970 (7th Cir. 1996), *aff'd on other grounds*, 522
U.S. 23 (1997), we read the same phrase in a student loan fraud
statute to require proof of a defendant's knowledge that her
intentional conduct was unlawful. See also *United States v.
Wheeler*, 540 F.3d 683, 690 (7th Cir. 2008) (expressing sympathy
for the argument in dicta).

This type of heightened proof requirement, however, is
typically limited to a narrow group of "highly technical [crim-
inal] statutes that present[] the danger of ensnaring individu-
als engaged in apparently innocent conduct." *Bryan v. United
States*, 524 U.S. 184, 194 (1998) (citing taxes and financial trans-
actions as examples). *Bates*, which concerned the arcana of
federal student loans, falls in that category. A statute prohib-
iting serious threats to the President does not. *Elonis* itself
highlights the distinction. It expressly rejected the notion that
the threat statute there, 18 U.S.C. § 875(c), required the gov-
ernment to show that the defendant knew that his conduct
was illegal. *Elonis*, 135 S. Ct. at 2009. Instead, the Court fol-
lowed "[t]he familiar maxim 'ignorance of the law is no ex-
cuse' … ." *Id.* The same approach is proper here. The Presi-
dent's safety does not turn on a defendant's familiarity with
the United States Code.

### III

The evidence before the jury was sufficient to support both of Dutcher's convictions, and the jury instructions fairly presented the relevant issues. We therefore AFFIRM the judgment of the district court.