In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 18-2612

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MOHAMMAD WAQAS KHAN,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15-cr-286-1 — **John Robert Blakey**, *Judge.*

———————————

ARGUED MAY 23, 2019 — DECIDED SEPTEMBER 3, 2019

———————————

Before BAUER, MANION, and BRENNAN, *Circuit Judges.*

BRENNAN, *Circuit Judge.* Digital platforms unleash instant and limitless capabilities; at the tap of a finger, one can touch the world. That power and freedom enables many noble pursuits. But, as this case shows, underneath the promise of modern connectivity can lurk a dark side.

Over a seven-week span, Mohammad Khan used Facebook and his job as an Uber driver to threaten and prepare for

mass murder. He posted messages threatening to "kill," "shoot," "hunt," "murder," and "put bullets in" his "targets." Khan's "targets" included "college student[s]," "vulnerable individuals," people "walking their dogs," "high net worth individual[s]," and "witnesses" that "get [in] the way." He aimed for "a real human tragedy" and "claim[ed] the loop area of Chicago to the Northern Lincoln Park area" as his "free kill zone." Worse, Khan planned to "purchase a [G]o[P]ro camera, strap it to [his] chest or forehead, record the killings, and upload them onto Facebook for everyone around the world to see the grisly footage of death."

Khan also drove for Uber. He posted messages about "dry run[s]" and carrying a loaded gun during shifts to prepare for "necessary murders"—in fact, several of his threatening posts occurred immediately before and after driving passengers. To add credence to his threats, Khan boasted his "mental fortitude to pull it off," posted photos of himself holding the guns he would use, and "sw[ore] to Allah and everything I hold dear that I will resort to murder in the next 30 days." That thirty-day deadline corresponded with the date Khan was to fly to Pakistan.

Khan used Facebook to draw the public into his world; instead he drew the attention of the FBI. His words and actions resulted in an indictment for making interstate threats to injure others, a violation of 18 U.S.C. § 875(c). At trial, Khan claimed his statements were not "true threats." A jury disagreed and convicted him.

Khan challenges his conviction, arguing that the government's indictment and evidence against him were insufficient. He also challenges the jury instructions for the § 875(c) charge and the district court's refusal to suppress all evidence

leading to his arrest. Neither challenge is persuasive, so we affirm.

## I

What prompted Khan's graphic posts? Three sources stand out. First, a pedestrian sued Khan and Uber after a traffic accident. Khan construed the lawsuit and related insurance claims process as "senseless provocations." Second, he believed "noise pollution around [his] house" to be "organized persecution," for which he promised murder in retaliation. Third, for unstated reasons, he believed Chicago Mayor Rahm Emanuel "doomed Chicago to an early grave." For that, Khan called Emanuel a "rabid dog" who "shall be taught a lesson [he] will not forget."

The Facebook posts at issue began in late March 2015 and ended about two months later with Khan's arrest. These included:

- April 5: "[I]f there are any more senseless provocations committed against me or my family, I will purchase a [G]o[P]ro camera, strap it to my chest or forehead, record the killings, and upload them onto Facebook for everyone around the world to see the grisly footage of death with their own eyes."

- April 9: "If these provocations do not cease right away I will head out to Chicago with my fourth generation Glock 19 and start hunting. I'm claiming the loop area of Chicago to the northern Lincoln Park area where the students be as free fire zones if push comes to shove. A free fire zone and a free kill

zone as well, because as I've stated in earlier contexts I will be aiming for the posterior part of the cranium."

- <u>April 14</u>: "Keep pushing me and it won't end well for a trucker on the road. I'll pull out my glock and shoot him on the highway, causing a massive pileup with many potential fatalities. … Be careful."

- <u>April 17</u>: "I've given plenty of warnings … and this kind of stuff tends to happen suddenly. I'm already carrying my gun with me to work and let me be frank here I see a great deal of vulnerable individuals, for example walking their dogs and whatnot."

- <u>May 2 (Post 1)</u>: "There will be blood running in the streets of Chicago as I had stated. In the next 30 days, I will undertake the necessary murders. … I swear to Allah and everything I hold dear that I will resort to murder in the next 30 days."

- <u>May 2 (Post 2)</u>: "It's not easy to kill. It takes mental fortitude to pull it off. I take this as a personal challenge … I'm gona try to empty out as much of the clip on the victim in a 5 second window as possible."

- <u>May 3</u>: "The … deadline I have set is not written in stone. If I see vulnerabilities, any at all, I will exploit them immediately. Murder is in the air on the streets of Chicago. I can't control my 9 [millimeter]."

- <u>May 7 (Post 1)</u>: "Tonight is promising to be a murderous night!"

- <u>May 7 (Post 2)</u>: "Alrightt … I'm goin hunting tonite baby!"

- <u>May 7 (Post 3)</u>: "If I see a high value target Ima exploit it. I'm not killin sum bum on the street. I want a high net worth individual to shoot. I want this to be a real human tragedy. Much mourned. I have a month. Ima hunt aggressively tonight. Keep an eye out for ideal victims. If I don't catch nobody tonite then another nite."

- <u>May 8</u>: "Good dry run tonight. Saw a couple of excellent targets. The key is right approach and timing. There were many potential witnesses because it was a college student night. Inshallah[1] the deed will be done well before the deadline I have set. … When I have said something, it means I will do it. The rest is opportune timing."

- <u>May 14</u>: "The gun is cocked and ready to go. … Now I'm gona get my revenge, and that involves putting bullets in someone's body, so get out of the way or I'll literally shoot at them as well and we'll end up with a much bigger scenario on our hands. I'm not leaving America without getting revenge even if it costs me my life. And that's that."

---

[1] "Inshallah" is an Arabic expression meaning "if Allah wills" or "God willing." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/inshallah (last visited September 3, 2019).

Khan sent the third May 7 post about hunting for "ideal victims" one minute before he picked up an Uber passenger. The May 8 post about a "dry run" was sent three minutes after he dropped off another Uber passenger. Khan's Facebook page also included several photos of guns and ammunition he threatened to use, as well as photos of him holding those weapons.

Law enforcement first learned of Khan's Facebook posts about a week after they began. The Illinois State Police run a website that allows users to send anonymous complaints. After police received an anonymous tip containing a link to Khan's Facebook page, they immediately notified the FBI but did not forward or save the original tip itself. Because Khan set his Facebook privacy settings to "public," anyone with access to Facebook (including the FBI) could view his comments and photos.

Khan sent the May 14 post, about getting revenge before leaving America, from his home. When he left his house later that day, surveilling FBI agents notified the DuPage County Sheriff's Department that Khan drove off after threatening to kill people in his car and that he may be armed.

At the FBI's request, Sheriff's Detective Patrick O'Neil found Khan about one block from his home, pulled him over, and asked him to step out of the car. When Khan opened the door, O'Neil saw the handle of a gun in the driver's side door. On O'Neil's order Khan walked to the rear of his car, where O'Neil told him that he was being "detained" for an FBI investigation. O'Neil then asked Khan if he was armed. Khan told O'Neil that a loaded gun was in the car and admitted he did not have a concealed carry license. O'Neil next asked for Khan's permission to get the gun. Khan agreed. Once backup

arrived, O'Neil recovered a nine-millimeter handgun—the same gun referenced and pictured in Khan's Facebook posts.

Sheriffs arrested Khan at the scene, and he was charged with violating Illinois's concealed carry laws. After Khan's arrest, sheriffs performed a routine inventory search of his car where they found a loaded magazine under the passenger-side front seat. That same day FBI agents obtained a warrant and searched Khan's home. There, agents found two guns depicted in Khan's Facebook photos—a .40 caliber semi-automatic handgun and a 12-gauge semi-automatic shotgun—and a box for the nine-millimeter handgun, which contained three loaded magazines.

A grand jury indicted Khan for violating 18 U.S.C. § 875(c), which makes it a crime to transmit in interstate commerce "any communication containing … any threat to injure the person of another." The indictment charged Khan with maintaining "an account at Facebook in his own name" and that he "used the account to post messages and photographs that could be viewed on the internet by all Facebook users." It also quoted the May 7 (Post 3), May 8, and May 14 posts, and described Khan's purchase of a plane ticket to Karachi, Pakistan for travel on June 8, 2015.

At trial, Khan denied his posts were threats. Instead, he said they were "[f]acetious," "artistic," "hyperbole," and emulations of rap songs "protected by the First Amendment." He also said he used Facebook like a "free notebook" that he believed no one would read. The jury rejected these defenses and found Khan guilty. The district court sentenced him to 41 months' imprisonment.

**II**

Khan challenges his conviction. He disputes his indictment, the jury instructions, the evidentiary rulings at trial, and the sufficiency of the evidence. We address each argument in turn.

**A**

We review the sufficiency of an indictment de novo. *United States v. Miller*, 883 F.3d 998, 1002 (7th Cir. 2018). An indictment must: (1) state the elements of the offense charged; (2) fairly inform the defendant of the nature of the charge so that he may prepare a defense; and (3) enable the defendant to plead an acquittal or conviction as a bar against future prosecutions for the same offense. *Id*. (citations and internal quotations omitted). The key question is whether the indictment sufficiently apprised Khan of the charges against him in order to enable adequate trial preparation. *See United States v. Vaughn*, 722 F.3d 918, 927 (7th Cir. 2013).

Here, the indictment mirrored the terms of § 875(c), alleging Khan "transmit[ted] in interstate commerce a communication containing a threat to injure the person of another, namely, the [May 14, 2015] communication … [i]n violation of Title 18, United States Code, Section 875(c)." So far, so good; Khan does not dispute that the indictment apprised him of the governing statute. Instead, he argues the indictment failed to allege he intended to make threats when he made the Facebook posts. Khan moved the district court to dismiss the indictment on the same grounds. The court denied his motion and characterized his objections as "a defense relating to the strength of the government's evidence [which] ordinarily must wait for trial."

Although § 875(c) omits any mention of criminal intent, the statute still "include[s] broadly applicable scienter requirements." *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) ("The fact that the statute does not specify any required mental state … does not mean that none exists."). "[T]he mental state requirement in Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." *Id*. at 2012.

This indictment did not explicitly accuse Khan of intending to send a threat, or allege that he knew the posts would be viewed as threats. But an indictment need not "spell out each element" as long as "each element [is] present in context." *United States v. Smith*, 223 F.3d 554, 571 (7th Cir. 2000). An implicit allegation of an element of a crime is enough; the indictment "need not specifically allege" every "component part of the offense." *United States v. Resendiz-Ponce*, 549 U.S. 102, 107-08, 108 n.4 (2007).

On its face, the indictment charged Khan with transmitting threats to "get my revenge," "hunt aggressively," "exploit," and "kill" "ideal victims." Those words denote purpose, knowledge, and intent. *See Smith*, 223 F.3d at 572 (rejecting challenge to language of indictment and holding "purpose, knowledge, and intent are inherent" in the words "induce" and "entice"). The indictment, reasonably interpreted and given the full context of its allegations, alleged Khan's intent.

Next, Khan argues the indictment failed to set forth who he threatened, as well as where, when, why, and how threatened violence would occur. The omission of these facts, he claims, rendered the indictment impermissibly "vague and

nonspecific." Khan asks too much of the indictment. We re-
view indictments "on a practical basis and in their entirety,"
not in a "hypertechnical manner." *Miller*, 883 F.3d at 1002.
"Although the indictment must provide some means of pin-
ning down the specific conduct at issue[,] … the presence or
absence of any particular fact need not be dispositive." *United
States v. Sandoval*, 347 F.3d 627, 633 (7th Cir. 2003).

Regardless, this indictment provides the facts Khan claims
are missing. It cites three specific threats, gives the itinerary
of Khan's flight to Pakistan, and states that the operative facts
were based on his Facebook "messages and photographs" ac-
cessible to "all Facebook users." That was enough to signal:
what (threats of mass murder); who (at least six specified "tar-
gets"); where (the Chicago loop to the Northern Lincoln Park
area); how (a nine-millimeter handgun, a .40 caliber semi-au-
tomatic handgun, and a 12-gauge semi-automatic shotgun);
why (Khan felt "provoked" by a lawsuit and noise pollution);
and when (before he jumped on a plane to Karachi).

The indictment satisfied all necessary criteria and amply
apprised Khan of the charges against him. The district court
did not err in refusing to dismiss it.

**B**

Khan next argues the district court failed to instruct the
jury on all elements of a § 875(c) offense.

We review this challenge in two steps. First, we review de
novo "whether [the] jury instructions accurately summarize
the law, but give the district court substantial discretion to
formulate the instructions provided that the instructions rep-
resent a complete and correct statement of the law." *United
States v. Bonin*, No. 18-1479, 2019 WL 3369562, at *8 (7th Cir.

July 26, 2019). "If the instructions are legally accurate, then we review the district court's phrasing of the instructions for abuse of discretion." *Id*.

Here, the instruction read:

> The indictment charges the defendant with transmitting, in interstate commerce, a threat to injure another person. In order for you to find the defendant guilty of this charge, the government must prove each of the three following elements beyond a reasonable doubt:
>
> 1. The defendant knowingly transmitted in interstate commerce the communication charged in the indictment, on or about May 14, 2015; and
> 2. This communication contained a true threat to injure the person of another; and
> 3. The defendant intended it to communicate a true threat or knew that the communication would be viewed as a true threat.

The jury instructions also said "[a] person acts knowingly if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident." As for a "true threat," the district court instructed the jury:

> A true threat is a serious expression of intent to commit unlawful physical violence against another person or a group of people. The communication must be one that a reasonable observer, considering the context and circumstances of

the statement, including surrounding communications, would interpret as a true threat.

The government does not have to prove that the defendant actually intended to carry out the threat, or even that the defendant had the capacity to do so. A threat does not need to be communicated directly to its intended victim, or specify a particular victim, or specify when it will be carried out.

A communication is not a true threat if it is merely idle or careless talk, exaggeration, or something said in a joking manner.

The instructions the district court gave the jury accurately and thoroughly summarized applicable law. According to *Elonis*, the Supreme Court's most recent decision on true threats, a conviction under § 875(c) requires: (1) the knowing transmission in interstate commerce of a communication; (2) the communication contained a threat; and (3) the communication was transmitted for the purpose of issuing a threat, or with knowledge that the communication would be viewed as a threat. *Elonis*, 135 S. Ct. at 2008–12. A "true threat" is "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *United States v. Parr*, 545 F.3d 491, 497 (7th Cir. 2008) (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). And "[a]true threat does not require that the speaker intend to carry it out, or even that she have the capacity to do so." *United States v. Dutcher*, 851 F.3d 757, 761 (7th Cir. 2017) (citations omitted). These holdings are reflected almost verbatim in the instructions Khan challenges. Khan fails to show an abuse of discretion.

Khan also argues the holdings of *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969), and *Black*, 538 U.S. at 359–60, require the district court to instruct the jury on three more elements: that Khan intended to communicate a threat; that the intended victim received it; and that it caused the victim to feel threatened.

Khan's request here is incorrect for three reasons. One, a true threat does not need to be communicated directly to the intended victim. *Parr*, 545 F.3d at 497. Two, Khan seeks a redundant instruction about his intent, as the elements instruction already included a scienter component when it required proof that Khan "knowingly transmitted" his posts. In essence, Khan demands an instruction requiring the government to prove that he intended to do what he knowingly did do: send Facebook posts accessible to all Facebook users around the world. At trial, Khan testified he considered his Facebook account a private diary, so he lacked intent to convey a threat or knowledge that his posts would be viewed as threats. Because he had only one "Facebook friend," he said he believed no one would see his messages. Using a social media platform to publish one's thoughts publicly on the Internet is an odd way to keep a "private" diary. Yet however flimsy this argument appears, it was the jury's province to weigh Khan's credibility and decide whether those posts qualified as true threats. *See id*. It did so and found Khan guilty.

Last, neither *Brandenburg* nor *Black* require proof that a victim felt threatened, as Khan insists. *Brandenburg* says that speech "directed to inciting or producing imminent lawless action" and "likely to incite or produce such action" falls outside the protection of the First Amendment. 395 U.S. at 447. *Black* held "a threat to a person or group of persons with the

intent of placing the victim in fear of bodily harm or death," is likewise unprotected. 538 U.S. at 359–60 (defining "[i]ntimidation" as a type of "constitutionally proscribable" speech). Khan posted increasingly aggressive promises to "murder" at least six specified "target" groups in a defined area of Chicago "well before" his dwindling deadline. These threats evince the type of intimidation and criminal action proscribed in *Brandenburg* and *Black*. And even if no one feared imminent action, nothing in *Brandenburg*, *Black*, or *Elonis* excludes the possibility of an unreported true threat. *See Dutcher*, 851 F.3d at 762 (rejecting contention that unreported Facebook post threatening to assassinate the president was not taken seriously). At any rate, an anonymous person viewed Khan's posts and took them seriously enough to pass them on to the Illinois State Police.

We find no error in the district court's jury instructions.

## C

Up next are Khan's evidentiary challenges: the admissibility of the gun found in Khan's car, and the anonymous tip forwarded to the FBI. Khan argues the district court should have suppressed this evidence. When reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error and issues of law de novo. *United States v. Key*, 889 F.3d 910, 912 (7th Cir. 2018).

## 1

We begin with the gun. Before trial, Khan moved to suppress the firearm seized from his car under two theories: the stop was not supported by reasonable suspicion, and he was entitled to *Miranda* warnings before being asked about a gun in the car. The district court denied Khan's motion, finding

reasonable suspicion for the stop. The court also found that, when asked about guns, Khan was not in custody for *Miranda* purposes. Khan reprises his arguments on appeal.

A traffic stop is lawful under the Fourth Amendment when a law enforcement officer has a particularized and objective basis for suspecting the person stopped of criminal activity. *United States v. Yancey*, 928 F.3d 627, 630 (7th Cir. 2019) (citations and internal quotation marks omitted). "When more than one police officer is involved in the reasonable-suspicion analysis, courts consider their collective knowledge." *United States v. Street*, 917 F.3d 586, 596 (7th Cir. 2019). The collective knowledge doctrine permits a stop at the direction of, or based on information relayed from, another law enforcement agency. *See United States v. Hensley*, 469 U.S. 221, 232–33 (1985); *see also Street*, 917 F.3d at 596. The doctrine applies even if the officer performing the stop does not have firsthand knowledge of information creating the justification for a stop. *Street*, 917 F.3d at 596. Nor does it matter that the communication is by dispatch or a "wanted" bulletin, rather than face-to-face. *Hensley*, 469 U.S. at 232; *Torry v. City of Chicago*, No. 18-1935, 2019 WL 3521146, at *5 (7th Cir. Aug. 2, 2019). But this doctrine is not an end around *Terry v. Ohio*— the officer or agency relaying the information must have reasonable suspicion to justify the stop. *See Hensley*, 469 U.S. 232-33. Reasonable suspicion exists when an officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Richmond*, 924 F.3d 404, 411 (7th Cir. 2019) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

We apply a three-pronged test to decide if collective knowledge exists: (1) "the officer taking the action must act in

objective reliance on the information received"; (2) "the officer providing the information—or the agency for which he works—must have facts supporting the level of suspicion required"; and (3) "the stop must be no more intrusive than would have been permissible for the officer requesting it." *Street*, 917 F.3d at 596–97 (citations and internal quotation marks omitted). In evaluating these elements, we consider all information known to officers at the time of the stop and give due weight to the trial court's assessment of the officers' credibility and the reasonableness of their inferences. *Richmond*, 924 F.3d at 410, 413.

All three elements were met here. At the suppression hearing, the district court heard testimony from O'Neil and the FBI agents who monitored Khan's Facebook page, surveilled his residence, and relayed his threats to state police. O'Neil testified he relied on the FBI agents' direction when he stopped Khan. The FBI agents gave specific reasons to stop Khan. They explained how Khan's Facebook posts crescendoed in hostility, flaunted "dry runs" during work, repeated an impending deadline, and climaxed in his final threat to kill. The agents also relied on several days of surveillance and interviews of individuals with personal knowledge of Khan. They gleaned even more information from public and law enforcement databases that corroborated aspects of his posts, including his job with Uber, his ownership of guns, and his plans to leave the country. These circumstances taken together gave the FBI reasonable suspicion to suspect Khan intended to commit a violent crime while driving. Finally, the stop was no more intrusive than the one the FBI could have conducted themselves. The district court appropriately imputed the FBI's knowledge and reasonable suspicion to O'Neil. Objectively, the stop was justified.

But Khan contends the stop, even if justified, amounted to a custodial arrest, requiring *Miranda* warnings before any question about weapons. *See, e.g.*, *United States v. Higgins-Vogt*, 911 F.3d 814, 820 (7th Cir. 2018) ("Miranda warnings must be provided at the outset of any custodial interrogation by law enforcement."). Setting to the side the legality of O'Neil's question to Khan about guns, we consider whether Khan was in police custody or under arrest when asked.

"[T]he temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) (citations omitted). Still, like any *Terry* stop, a traffic stop must be reasonably related in scope to the circumstances which justified the stop in the first place. *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 185 (2004). It also "cannot continue for an excessive period of time or resemble a traditional arrest." *Id.* at 185–86 (citation omitted). Khan highlights two parts of O'Neil's testimony: that O'Neil did not know how long the stop would last, or where the questioning of Khan would occur. This uncertainty and potential for an indefinite detention, Khan claims, converted the stop into a custodial arrest.

Khan's argument misses the mark. We do not evaluate the abstract chance of an excessive detention. What matters is "whether law enforcement *has detained* the person longer than needed to carry out the investigation that was justified by the reasonable suspicion." *United States v. Lopez*, 907 F.3d 472, 486 (7th Cir. 2018) (emphasis added). Khan ignores this question altogether and submits no evidence showing that he was subjected to a stop more excessive in duration, scope, or degree of intrusion than that needed to carry out the reason for the

stop—an investigation triggered by his online threats to shoot people from his car. Finding no evidence of an excessive stop in the record ourselves, we see no error in the district court's conclusion that Khan was not in custody or under arrest when O'Neil asked him about guns. With that issue resolved, we turn to O'Neil's question.

The public safety exception to *Miranda* allows police officers to question a suspect without first giving *Miranda* warnings if they reasonably believe the questions are "necessary to secure their own safety or the safety of the public." *New York v. Quarles*, 467 U.S. 649, 655–57, 659 (1984); *see also United States v. Hernandez*, 751 F.3d 538, 540 (7th Cir. 2014) (holding same). O'Neil's question fits within this exception. At the suppression hearing, O'Neil testified he asked Khan about a gun in his car for "officer safety" and to dispel his suspicion that Khan had other guns with him. [R. 145, p. 227, 335.] O'Neil had reason to be concerned: he saw a gun in Khan's driver's side door. O'Neil was not required to ignore the gun, *Quarles*, 467 U.S. at 657 (holding a gun left unattended was a public safety concern); grab the gun, *Hernandez*, 751 F.3d at 542 (recognizing the risk of grabbing and setting off a loaded gun); or allow Khan to bolt for the gun, *Richmond*, 924 F.3d at 417 (recognizing the risk of a gun within a few steps from a suspect). Accordingly, O'Neil's question if Khan was armed fell within the public safety exception to *Miranda*. Khan's responses to that question, which included giving O'Neil permission to get the gun, pose no admissibility problems.

The district court properly denied Khan's motion to suppress the gun evidence.

**2**

Khan also sought to suppress all evidence against him because the government could not produce a copy of the anonymous tip sent to Illinois State Police. The district court denied this request, finding the tip immaterial to the government's investigation and no bad faith by the government.

At trial, Michael Forsythe, an administrative assistant for the state police, testified he received the tip via the state police website. After reviewing the tip, Forsythe sent an email to the FBI with a link to Khan's Facebook profile. Critically, state police cannot trace the tip's source, nor do they retain a copy of the tip (consistent with their email retention policies). They did, however, preserve evidence of Forsythe's email to the FBI in an "Internet Activity Report." Khan received a copy of this report in preparation for trial. On appeal, Khan contends the district court abused its discretion when it allowed testimony about "destroyed" evidence.

To be sure, the government has an affirmative duty to preserve and disclose material evidence favorable to a defendant. *Arizona v. Youngblood*, 488 U.S. 51, 55, 57–58 (1988). The government violates that obligation if, acting in bad faith, it fails to preserve potentially exculpatory evidence that a defendant would be unable to obtain by other means. *Id*.; *see also United States v. Bell*, 819 F.3d 310, 317–18 (7th Cir. 2016) (bad faith is "an official animus or a conscious effort to suppress exculpatory evidence," which "turns on an official's subjective knowledge that the evidence in question had exculpatory value at the time it was lost or destroyed"). But according to Forsythe's testimony, the anonymous tip was neither exculpatory nor substantively material. Indeed, the government

took on a credibility risk by discussing evidence it never produced. Over the government's objection, the district court allowed Khan to argue to the jury that the tip was intentionally destroyed. Khan also had all relevant information about the tip: the date, time, how it was sent, who received and reviewed it, and its substantive content. And Khan cross-examined the government's witnesses on all this information. The district court did not abuse its discretion when it found the government's failure to produce a copy of the tip was immaterial.

## D

Finally, we address Khan's assertion he was convicted on insufficient evidence. His challenges face a high hurdle: we afford "great deference" to a jury verdict of conviction, view the evidence in the light most favorable to the government, and draw all reasonable inferences in the government's favor. *United States v. Moreno*, 922 F.3d 787, 793 (7th Cir. 2019). We will reverse a conviction only where the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt. *United States v. Heon Seok Lee*, No. 18-1687, 2019 WL 3940951, at *6 (7th Cir. Aug. 21, 2019).

Khan first asserts the government failed to prove "the target of the alleged threat[s]." Not so: Khan in fact called his potential victims "targets," which included college students, people walking their dogs, truckers, and anyone else who happened to be in the wrong place (Khan's defined "free kill zone") at the wrong time (before his June 8, 2015 flight to Pakistan). The recipients of Khan's threats are quite clear.

Khan also claims the government failed to prove his Facebook posts were true threats or that he intended to convey

those threats to anyone else. Before the Supreme Court's decision in *Black*, 538 U.S. at 358–59, we used an objective reasonable person standard to determine whether speech constituted a true threat. *See Maier v. Smith*, 912 F.3d 1064, 1072 (7th Cir. 2019) (citing *Parr*, 545 F.3d at 499). After *Black*, "we and other courts have wondered whether speech only qualifies as a true threat if the speaker subjectively intended his words to be threatening." *Id*. (citing *Parr*, 545 F.3d at 499-500). "[T]he Supreme Court has not definitively answered the question." *Id*. But we need not press this issue here. Khan's posts were so violent, explicit, and resolute that they constituted threats under either an objective or subjective standard. Among other macabre warnings, Khan repeatedly and categorically threatened to murder defined targets in a defined area of Chicago and livestream "the grisly footage of death." He also tied his threats to "revenge" for "provocations" and "persecutions" against him, connected the date of any attempted murder to his flight out of the country, and bragged about his "mental fortitude to pull it off." These personal referents undercut Khan's defense that his words were artistic expressions. This is enough to reasonably infer Khan's intent to commit an act of unlawful violence towards a particular group of individuals.

Last, Khan contends the government offered no evidence that his threats would be seen. This also is not true: Khan's posts were seen by at least one observer, who passed them on to police. After that, the FBI continued to monitor Khan's public threats in a forum accessible to over one billion Facebook users. The evidence amply supports Khan's conviction.

### III

Boundless connection to the world can betray. Such was the case for Khan. We find no error in the district court's rulings, and AFFIRM Khan's conviction.