*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 29, 2021

Plaintiff-Appellant,

v

No. 354414
Oakland Circuit Court
LC No. 2018-269141-FH

JAY DAVID SOULLIERE,

Defendant-Appellee.

Before: RIORDAN, P.J., and M. J. KELLY and SHAPIRO, JJ.

SHAPIRO, J (*dissenting*).

I respectfully dissent. Following a two-day evidentiary hearing, the trial court granted defendant's motion to suppress evidence obtained following an investigatory stop and dismissed the charges. The trial court's decision was proper and I would affirm.

The United States and Michigan Constitutions guarantee the right to be free from unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11. "Generally, searches or seizures conducted without a warrant are presumptively unreasonable and, therefore, unconstitutional." *People v Barbarich*, 291 Mich App 468, 472; 807 NW2d 56 (2011). One exception to the general prohibition against warrantless searches and seizures is the so called "*Terry* stop." See *People v Pagano*, ___ Mich ___, ___; ___ NW2d ___ (2021) (Docket No. 159981); slip op at 4, citing *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968). Under *Terry*, "if a police officer has a reasonable, articulable suspicion to believe a person has committed or is committing a crime given the totality of the circumstances, the officer may briefly stop that person for further investigation." *Barbarich*, 291 Mich App at 473. A reasonable suspicion is less than the level of suspicion needed for probable cause, but something more than an inchoate or unparticularized suspicion, i.e., a "hunch." *People v Champion*, 452 Mich 92, 98; 549 NW2d 849 (1996).

The trial court correctly determined that the totality of the circumstances at the time of the stop did not give rise to a reasonable suspicion that defendant was engaging in criminal activity. First, the officers were acting on a tip about a different person and a different house. They were not investigating defendant or the house where the alleged drug transaction occurred, i.e., the

Farmdale house; rather, after having no luck at the house they were staking out, they decided to conduct surveillance at the Farmdale home because, per their testimony, it was a "known drug house" that the individual they were looking for had frequented. Detective Bishop testified that he knew "that Oakland County Narcotics, my previous person who was in that from Ferndale had open cases and investigations on that 560 Farmdale address that dated back to 2014 and '15," although probable cause had never been established to search the home. Further, there was no evidence that the person they were looking for ever arrived at the house that day, and Deputy Panin conceded that he did not observe any other activity at the Farmdale house on that day indicative of drug activity. Given that the officers did not have first-hand knowledge or contemporaneous observations of drug activity at the Farmdale house, the location itself provides very weak indicia of criminal activity.

Regardless, it is clear that a finding of reasonable suspicion in this case rests primarily on the alleged hand-to-hand transaction. Located about 200 yards away,[1] Deputy Panin testified that using binoculars he observed an exchange of money between defendant and the passenger of defendant's vehicle after the passenger had exited the vehicle. According to Panin, defendant was the recipient of the money. Panin did not see any drugs or packages being exchanged, but he inferred that the money had been for drugs based on his experience and knowledge of "short term" drug transactions. The problem with Panin's testimony, however, is that it is entirely inconsistent with the physical evidence recovered from defendant's vehicle. That is, no money was found on defendant or in his vehicle following a thorough search despite the fact that defendant had made no stops since he left the Farmdale house. Faced with this conundrum of the non-existent money, the prosecution now suggests that Panin made a mistake and that defendant was actually giving the money to the passenger of his vehicle instead of receiving it. The record cannot support this new assertion, however, because Panin specifically testified that he observed from his distant vantage point "the passenger handing the driver money and . . . the driver, as if they were counting money."[2] In other words, Panin did not observe a quick exchange where he may have mistakenly believed that the driver was the recipient; rather, he purportedly saw the driver, i.e., defendant, counting the money after receiving it from the passenger. Accordingly, the prosecution's alternative theory that the money was going to the passenger has no basis in the record. And, given that no money was found on defendant or in his vehicle after a thorough search, I do not see how Panin's observations that an exchange of money occurred can be deemed credible. To be clear, the officer's claimed observations on which the entire claim of reasonable suspicion rests were

---

[1] At the preliminary examination, Panin estimated he was located 200 or 250 yards away from defendant's vehicle. At the evidentiary hearing, he estimated he was 125 to 200 yards away.

[2] Panin confirmed this on further questioning, stating that "I saw the driver, what I believed to be, sat and counting the money and then shortly thereafter, the passenger exited the vehicle and went to the house." He similarly testified as follows at the preliminary examination: "The passenger door opened, there was what appeared to be an exchange of words between the driver and the passenger. After a short period of time, I witnessed what I -- what I saw was some kind of transaction between the driver and passenger. And then I witnessed money being counted by the driver." He also testified that the exchange took one to two minutes.

*definitively* shown to have been either mistaken or invented, and it is difficult to see how these very specific "observations" were simply a mistake.

The majority asserts that Detective Bishop ordered the stop based in part on "what he knew about defendant prior to the investigatory stop in question from former narcotics investigations involving defendant and methamphetamine." This misstates the record. The stop was based solely on Deputy Panin's observations, and there was no testimony that Panin: (1) knew defendant prior to that day; (2) identified defendant as the driver; or (3) relayed to Bishop that defendant was the driver. The majority relies on Panin's testimony that he informed Bishop of the grey sedan's Ohio license plate number and concludes that "[t]his would have connected defendant to the vehicle." However, this conclusion is speculative because the record does not indicate whether the vehicle was registered to defendant or that Bishop ran a license plate check. Accordingly, although Bishop testified that he knew of defendant from prior investigations, the record does not support the conclusion that Bishop knew defendant was the driver at the time he ordered the stop.[3] Thus, based on the record before us, Bishop's prior knowledge of defendant has no bearing on whether the officers had a reasonable suspicion of criminal activity at the time the stop was made. See *Champion*, 452 Mich at 98 ("A valid investigatory stop must be justified at its inception . . . ."). See also *United States v Hollins*, 685 F3d 703, 706 (CA 8, 2012) ("The determination of whether probable cause, or reasonable suspicion, existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time.") (quotation marks and citation omitted).

In sum, the officers were looking for an individual other than defendant at a home where they observed no drug-related activity. Defendant arrived at the home with a passenger, and one officer believed that he saw the passenger hand defendant money—but no drugs or packages—after leaving the vehicle and entering the house. However, the subsequent stop and search definitively established that defendant had not received any money, i.e., the claimed exchange of money never occurred. Under the totality of the circumstances, I conclude that the trial court correctly granted defendant's motion to suppress evidence and dismiss charges.

/s/ Douglas B. Shapiro

---

[3] The majority's reliance on the collective knowledge doctrine is misplaced. If Detective Bishop did not know that defendant was the suspect *at the time of the stop*, his prior knowledge of defendant is immaterial for purposes of a determining whether a reasonable suspicion of criminal activity existed. See *United States v Khan*, 937 F3d 1042, 1053 (CA 7, 2019) ("In evaluating [whether collective knowledge exists], we consider all information known to officers at the time of the stop . . . .").