In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-3425

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ERNESTO GODINEZ,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18 CR 278 — **Harry D. Leinenweber**, *Judge.*

SUBMITTED JANUARY 20, 2021 — DECIDED AUGUST 4, 2021

Before EASTERBROOK, WOOD, and BRENNAN, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Law enforcement officers entered a southwest Chicago neighborhood one night to replace tracking devices on the cars of several Latin Saints gang members. Shortly after the officers arrived, they came under gunfire and a federal agent was shot and seriously injured.

A federal grand jury indicted Ernesto Godinez, a member of the gang, for the shooting. In the government's view,

Godinez, tasked with guarding the neighborhood, mistook federal agents from the Bureau of Alcohol, Tobacco, and Firearms ("ATF") for rival gang members and shot Special Agent Kevin Crump. After a six-day trial, a jury found Godinez guilty.

Godinez now appeals, arguing that the district court wrongly admitted certain evidence and that the jury did not receive sufficient evidence to convict him of shooting Crump. We conclude that the district court properly admitted ballistics evidence concerning the shots fired, although evidence from and testimony about a gunshot detection system—ShotSpotter—should have been handled differently. Because a rational jury, even without the improperly admitted evidence, could have found beyond a reasonable doubt that Godinez shot Crump, we affirm.

**I**

Given the jury's verdict, we view the trial evidence in the light most favorable to the government. *United States v. Wallace*, 991 F.3d 810, 812 (7th Cir. 2021).[1] A portion of the government's case consisted of video evidence compiled and synchronized from various police and private surveillance cameras. Some videos have multiple panes, allowing the viewer to track the movement of individuals or cars. The ATF's technical specialist also inserted circles around cars or persons of interest for the compiled videos. At trial, the defense used these videos as well, which without dispute depict

---

[1] The facts relayed below are taken from the trial transcript, videos, and exhibits in the district court.

Godinez. No video showed Godinez shooting a gun, how-
ever.

## A

On May 4, 2018, ATF agents and Chicago police officers
went to the "Back of the Yards" neighborhood[2] to replace
court-approved global positioning system trackers on cars be-
longing to members of the Latin Saints gang. The neighbor-
hood has a typical municipal grid pattern with streets at right
angles. These events took place between the 4300 and 4400
block of parallel north-south streets, South Wood Street and
South Hermitage Avenue. An alley runs between and parallel
to those streets, and various gangways between houses allow
east-west access mid-block.

Latin Saints gang member Ernesto Godinez lived in the
Back of the Yards. Another gang member, Hector Ruiz, who
is also a paid government informant, confirmed that Godinez
was in the gang and thus would have been expected to patrol
the neighborhood. For the jury, Ruiz outlined the gang's ter-
ritory and described the expectations of Latin Saints to protect
that area from rival gang members by "[p]osting up," "24/7."
Ruiz affirmed that meant Godinez had to shoot any rival gang
members he spotted while on patrol, testifying that if rival
gang members enter the neighborhood, Latin Saints gang
members are to "[c]hase them or shoot at them."

At 2:56 a.m. on May 4, video shows Godinez wearing dark
clothing leaving the area of his house on South Wood Street.
He drove around the neighborhood at a relatively slow speed,

---

[2] So named for its proximity to the former Union Stock Yards. *See* Up-
ton Sinclair, *The Jungle*, 2 (1906).

as if patrolling, and he arrived home and parked near the intersection of 44th and Wood.

At around 3:15 a.m., ATF agents in street clothes and an unmarked car drove slowly around this same neighborhood to assess how safe it was and to locate the target cars. They parked on the 4400 block of South Hermitage. When this first undercover car passed, video shows Godinez running into his house, leaving shortly after, and then running north. He crossed the alley and then entered a gangway between the houses at 4332 and 4336 South Hermitage Avenue.

At about 3:17 a.m., a second group of agents, using a rental car to avoid detection, drove down Hermitage. These plain clothes agents—Crump, Daniel Winter, and Thomas Spratte—exited the car near the intersection of 44th and Hermitage to approach the target vehicles on foot. They wore sweatshirts with hoods up.

At 3:18 a.m., those same agents began to cross the street and heard five gunshots. Winter and Spratte both recalled that the shots came from the northwest. Spratte sought cover behind a parked car and looked over his shoulder. He testified that he saw the shots come from about halfway up the 4300 block of South Hermitage Avenue on the west side of the sidewalk. Spratte saw two muzzle flashes, immediately fired his gun twice toward those flashes, and yelled, "shots fired."

When Winter asked Spratte where the shots came from, Spratte pointed to the location of the two muzzle flashes. Spratte did observe an individual with a white t-shirt on Hermitage, although he does not recall exactly when. But Spratte did not see the person next to the muzzle flashes, and Spratte did not fire his gun at that person.

As the agents started to head north towards the shots, they realized that Crump had been hit and was on the ground bleeding. The bullet entered Crump's neck just below his left ear, exiting his face through the bridge of his nose between his eyes. Since being shot, Crump has undergone two surgeries, and the wound affects his vision. Crump did not see who shot him or where the shots came from.

At 3:18:26 a.m., immediately after the shooting, video shows Godinez running across the alley and heading toward his house. Godinez moves with his right hand at his side, but the video does not reveal whether he is holding something.

Before the shooting, Godinez had been exchanging messages via Snapchat with his then-girlfriend, Valerie Jean-Baptiste, who lived in the neighborhood. Godinez told Jean-Baptiste to pick him up by 44th and Wood. Before she left her house, Jean-Baptiste heard the shooting outside her open windows. Then she quickly sent a message to Godinez asking his location. He responded, "[b]y his house," so Jean-Baptiste drove her car there. Video showed her arriving in a sedan and picking Godinez up within five minutes of the shooting. Godinez entered her car wearing dark clothing and a baseball cap that was later found in the car and containing his DNA. Jean-Baptiste testified that Godinez told her: "I feel good. F*** that flake." Jean-Baptiste confirmed that Godinez was the person in the videos.

Together, Jean-Baptiste and Godinez drove to a nearby gas station. On the way, they downloaded a cellphone application for a police scanner to monitor law enforcement activity in the neighborhood. They next drove to a second gas station where Godinez bought a white t-shirt that he put on over his black shirt.

Later that morning, Godinez went to his cousin's house and dropped off the car he had driven earlier that day to patrol the neighborhood. In the evening, Godinez returned to that house with his son and son's mother, Destiny Rodriguez. She showed Godinez a purported "wanted" picture with his face on it and started to cry. Hugging Rodriguez and their son, Godinez said he loved Rodriguez and that he was sorry for everything he ever did that hurt her. At that house, Godinez also stopped using one of his cellphones, which he left there.

The same day of the shooting, Chicago police went to the Back of the Yards neighborhood to investigate. At trial, Forensic Investigator Paul Presnell testified about his work at the scene, which included videotaping, photographing, drawing a plat map, and searching for and marking evidence. Presnell described the ballistics evidence recovered at the scene. Five casings were found in a gangway between 4332 and 4336 South Hermitage Avenue. Those casings were clean and shiny, not weathered. Presnell came upon four of these casings after other officers had placed yellow crime scene markers noting their location. He photographed and collected those four casings, and after he left the gangway to search further, he found a fifth casing nearby under a leaf. Presnell also found a bullet lodged in the north side of a tree in front of 4343 South Hermitage Avenue and a bullet in the grass between the street and the sidewalk in front of 4416 South Hermitage Avenue.

The jury heard expert testimony from ATF Firearms Examiner Arnold Esposito as well. He testified that the five casings recovered from the gangway were fired from the same 9mm caliber firearm; that the bullet from the tree and the

bullet found in the grass were both fired from the same gun; and that most of the possible firearms from which the bullets could have been fired were 9mm caliber.

The government also presented evidence from ShotSpotter, an acoustic gunshot detection and location system. The district court qualified ShotSpotter employee Paul Greene as an expert witness. Greene described ShotSpotter as a series of sensors installed in a geographic area that listen specifically for the sound of gunfire. When shots are detected, the time and certain measurements are sent to a central location where software classifies the sound as gunfire or not. If it is gunfire, ShotSpotter calculates the point of latitude and longitude where the gun was fired. That information is then reported to law enforcement.

Greene testified about his analysis of the May 4 audio clips from the sensors near 44th and Hermitage. Initially, ShotSpotter identified two gunshots as having been fired near the southeast corner of 44th and Hermitage between 3:18:14 a.m. and 3:18:15 a.m. Greene testified that ShotSpotter typically has an accuracy of 10 to 12 feet. An hour or so later, Chicago police contacted ShotSpotter and asked them to search for additional audio clips of five shots, which had not been automatically identified as gunshots. Greene said this happens "on a semiregular basis with all of our customers." ShotSpotter located those audio clips and identified five gunshots located at 4338 South Hermitage Avenue, between 3:18:10 a.m.

and 3:18:12 a.m. The district court admitted the audio recordings of the shots into evidence.[3]

The Snapchat text messages exchanged between Godinez and Jean-Baptiste before and after the shooting were also received into evidence, as were location records from their Snapchat accounts, which are accurate within 100 meters. The government created animations to show the location of their phones on May 4, 2018. Those animations indicated that Godinez's phone was near the location of the shooting when it occurred, as well as near the home of his cousin later the same day.

In addition, the jury heard from Chicago Police Sergeant Neil Evans, who interviewed Spratte the morning of the shooting. Evans was questioned about Spratte's statements that he had seen muzzle flashes halfway up the 4300 block of South Hermitage Avenue as well as an unknown person in a white t-shirt. ATF Special Agent Beau Jacobsen also testified about video showing an unknown person wearing a white t-shirt at the south end of the alley between South Wood Street and South Hermitage Avenue at 2:52 a.m., 26 minutes before the shooting.

---

[3] Before the jury, Greene described how ShotSpotter works. He testified that ShotSpotter employs "multilateration"—its term for using several known geographic points to identify an unknown one. It calculates a sound's different arrival times at different sensors to plot a hyperbolic curve. Repeating this process over multiple pairs of sensors generates a series of curves. Plotting the curves on a map results in the curves intersecting at a geographic coordinate with a specific latitude and longitude. ShotSpotter then uses software to match that geographic coordinate with a street address along with a time of the shooting and the number of rounds fired.

**B**

A federal grand jury indicted Godinez for forcibly assaulting a federal officer while using a deadly weapon in violation of 18 U.S.C. § 111(a) and (b), along with discharging a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii). For both crimes, the only element in dispute was whether Godinez was the person who shot Crump.

Godinez moved in limine to bar the ballistics evidence and firearms expert Esposito's testimony, as well as the ShotSpotter evidence and ShotSpotter employee Greene's testimony. Godinez argued the government had not matched any spent casings to bullets and that no evidence had been presented as to the make and model of the gun used or as to when the bullets were fired or casings released. On the admissibility of the ShotSpotter evidence under Federal Rule of Evidence 702, Godinez also requested that the district court conduct a hearing under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

In his motion in limine, Godinez argued that the ShotSpotter methodology and its underlying data were not the product of reliable principles and methods. ShotSpotter's programming and algorithms have never been peer reviewed, Godinez contended, so the district court should hold a *Daubert* hearing and require the government to establish ShotSpotter's reliability. If the district court did find the technology reliable under *Daubert*, Godinez argued that ShotSpotter had deliberately placed the approximate locations of shots at the crime scene, so that evidence should be excluded as unduly prejudicial under Federal Rule of Evidence 403.

In pretrial rulings, the district court orally denied Godinez's evidentiary motions. First, the district court conducted a Rule 403 analysis and concluded that the ballistics evidence was relevant and not overly prejudicial to Godinez. To the district court, that evidence could be used to show how the bullets were matched to each other and how the casings were matched to each other. The government planned to offer expert testimony to shed light on what type of gun was used—a matter, the district court concluded, central to the jury's decision.

The district court also ruled that the ShotSpotter evidence was admissible under Rule 702 and *Daubert*. The district court relied upon *State v. Hill*, in which the Supreme Court of Nebraska affirmed a trial court's qualification of Greene as an expert and its determination that the ShotSpotter system was sufficiently reliable. 851 N.W.2d 670, 689–90 (Neb. 2014). Godinez had cited no authorities to demonstrate otherwise, the district court noted, and cross-examination could test the accuracy of Greene's methods and conclusions. Ultimately, the district court remained unconvinced that the ShotSpotter evidence was unduly prejudicial.

Later in that hearing, Godinez argued that no party in the jurisdiction had challenged ShotSpotter's methodology under *Daubert*. So Godinez again asked for a *Daubert* hearing and that Greene testify outside the jury's presence. According to Godinez, this would allow for vetting of ShotSpotter's technology and methodology.

The district court rejected as unnecessary Godinez's request for a *Daubert* hearing, noting that this type of evidence had been tested in 80 cases involving Greene. Without Godinez calling an expert witness on this topic, the district

court concluded that the government had satisfied the requirements of *Daubert*. Still, the district court devised a compromise—the government was to make Greene available for questioning by the defense before cross-examination on the stand, so the defense would have an advantage. For the district court:

> [T]he principles that [Greene]'s espousing, it's not a question where he's pulling this out of the air. … the principles, I think, are valid. Whether or not they've been properly utilized, of course, is subject to cross examination. … That's all that *Daubert* requires.

The district court reasoned those witnesses would also corroborate where the shots came from on Hermitage. So it stood by its initial ruling denying Godinez's motion to bar the ShotSpotter evidence and Greene's testimony.

After a six-day trial, a jury found Godinez guilty on both counts. He then moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 and for a new trial under Federal Rule of Criminal Procedure 33. The district court denied both motions. Godinez received a total sentence of 200 months' imprisonment and timely appealed his convictions.

## II

First, we address the district court's decisions to admit: (A) the ballistics evidence, and (B) the ShotSpotter evidence, including to qualify Paul Greene as an expert witness.

## A

The district court's admission of the ballistics-related evidence—the testimony from forensic investigator Presnell and firearms examiner Esposito, as well as the physical evidence

of the bullets and casings—is reviewed for abuse of discretion. *United States v. Johnson*, 916 F.3d 579, 588 (7th Cir. 2019).

Godinez argues that Presnell should not have been permitted to testify that the casings were located at the mouth of the gangway between the houses at 4332 and 4336 South Hermitage Avenue. Recall that Presnell did not know who found four of the casings, only that he came upon them after yellow crime scene markers already noted their location. To Godinez, this meant that reasonable precautions required to show a chain of custody had not been taken. For example, after Presnell left the gangway to continue his search, it was left unsecured, and only after Presnell returned did he find a fifth casing under a leaf.

Godinez's contention falls short, though, because a chain of custody need not be perfect. "[T]he government need only show that it took reasonable precautions to preserve the original condition of the evidence." *United States v. Lee*, 502 F.3d 691, 697 (7th Cir. 2007) (internal quotation marks omitted). "When the evidence is in police custody, a presumption of regularity applies; in the absence of evidence to the contrary, we assume the police did not tamper with the evidence. And any gaps in the chain of custody go to the weight given the evidence, not its admissibility." *United States v. Vitrano*, 747 F.3d 922, 925 (7th Cir. 2014) (citations omitted). At trial, Presnell described the reasonable precautions undertaken to handle this ballistics evidence. These included wearing latex gloves, placing it into envelopes or bags, sealing those in a clear plastic bag with the date and his identifying information, placing the evidence in inventory using the Chicago Police Department "eTrack" system, storing the bag in his locked office, and recovering the evidence using barcode

scanning. Godinez was free to, and did, raise and explore dur-
ing cross-examination any alleged gaps in the custody chain.
But because the evidence was in police custody with no signs
of tampering, the presumption of regularity applies. *See id.*
Therefore, the district court did not abuse its discretion in al-
lowing Presnell to testify to the location of the casings.

According to Godinez, no connection exists between the
casings found in the gangway between 4332 and 4336 South
Hermitage Avenue and the bullet that struck Crump. Bullets
and casings are strewn throughout a violent, high-crime
neighborhood like Back of the Yards, he claims. For Godinez,
the presence of the casings near the gangway—and of bullets
in a straight line from where the casings were found—does
not make it more likely that the officers were shot at from the
gangway, so this evidence is not relevant and should not have
been admitted.

We disagree. Although the gun used to shoot Crump was
not recovered, that does not render inadmissible the physical
evidence that was recovered. Esposito testified that the five
casings located in the gangway were all fired from the same
gun. And according to Presnell, those casings were shiny, not
weathered; so the jury could infer they resulted from a recent
shooting. Esposito also testified that the two bullets found
were fired from the same gun, and that the gun was most
likely a 9 mm firearm. This type of gun usually ejects casings
to the right. As the government argued at closing, if the
shooter stood at the mouth of the gangway and fired south
down Hermitage toward its intersection with 44th where
Crump was hit, the casings would have ejected from the gun's
right, landing where they were found—five to ten feet into the
gangway. Esposito's testimony at trial thus fits, rather than

conflicts, with what had been recovered on the ground after the shooting. Because Godinez has offered only speculation as to how five fresh casings ejected from the same gun were found in this same location, the district court did not abuse its discretion in admitting the ballistics evidence.

**B**

Next, we consider the admission of the ShotSpotter evidence and the expert testimony of Paul Greene, a ShotSpotter employee.

Federal Rule of Evidence 702 and *Daubert* govern the admissibility of expert testimony. We review de novo whether a district court properly applied the framework in Rule 702 and *Daubert*. *United States v. Jett*, 908 F.3d 252, 265 (7th Cir. 2018). If the district court did so, the decision to admit or exclude expert testimony is reviewed for abuse of discretion. *Id.* But if the district court failed to perform a *Daubert* analysis, the admissibility of the expert testimony must be reviewed de novo. *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 872–73 (7th Cir. 2021) (collecting cases); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010).

Here, the district court sufficiently grounded its rulings on the ShotSpotter evidence within the *Daubert* framework to ensure deferential standard of review. To be sure, a failure to perform a *Daubert* analysis entirely, or a conclusory, one-sentence ruling, can trigger de novo review. *See Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 844 (7th Cir. 2017); *Metavante*, 619 F.3d at 760. But the "district court's analysis here, although concise, is much more thorough than these conclusory determinations." *Kirk*, 991 F.3d at 873. So we review the district court's analysis for an abuse of discretion.

Among Rule 702's requirements are that a witness must be "qualified as an expert by knowledge, skill, experience, training, or education" and that the expert's testimony must be "the product of reliable principles and methods." FED. R. EVID. 702. In *Daubert*, the Supreme Court explained that Rule 702 grants to the district court the gatekeeping responsibility to ensure the reliability of proposed expert testimony. 509 U.S. at 589. In serving as gatekeeper, the district court is to evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Kirk*, 991 F.3d at 872 (internal quotation marks omitted).

Godinez asked for a *Daubert* hearing three times—in his motion in limine, during a pretrial hearing, and just before Greene testified in front of the jury. Although Godinez primarily challenged the reliability of the ShotSpotter methodology, at times he also contested Greene's qualifications. Whether a *Daubert* hearing is necessary before trial lies within the district court's discretion, and here the district court declined Godinez's requests for a hearing as unnecessary. Instead, the district court performed its *Daubert* analysis based on the parties' written submissions and their oral argument.[4]

The district court initially strayed in its *Daubert* analysis by relying on the Supreme Court of Nebraska's decision in *Hill*. Unlike Godinez, the criminal defendant in *Hill* did not "challenge the underlying GPS triangulation methodology upon which the ShotSpotter location is based." 851 N.W.2d at 690.

---

[4] We note that the compromise offered by the district court—allowing the defense to question Greene before he took the stand—does not appear to have occurred.

Additionally, the trial court in *Hill* conducted a *Daubert* hearing, *id.* at 679–81, unlike the district court in this case. That Greene had been qualified as an expert in several other cases, as the district court noted, is material to any *Daubert* analysis. But his qualification in *Hill* does not ensure the reliability of ShotSpotter's methodology here.

In concluding that *Daubert* had been satisfied, the district court also stated that the principles underlying ShotSpotter are not pulled "out of the air" and pointed out Godinez's opportunity to cross-examine Greene on whether those principles were properly utilized. Godinez's objections and arguments in this case, however, merited an opportunity to question and dispute those principles and their reliability before trial.

Most important for us in this review is that the ShotSpotter evidence admitted at trial implicated that system's methodology. Recall that at first, the system identified two gunshots— Spratte's return fire. Then, after Chicago police contacted ShotSpotter and asked them to search for additional audio clips, the system identified five more preceding shots. This identification and location process goes to how ShotSpotter collects, analyzes, and reports its data—its methodology. In this case, the district court never sufficiently explored this issue. Criticism of that methodology formed part of the defense here, therefore deserving a more thorough exploration by the district court.

To be sure, we have no reason to conclude that the ShotSpotter reports or analysis were manipulated to support a certain outcome. Greene's testimony may well be correct that the request to review audio for further shots occurs "on a semiregular basis with all of our customers." And the

ShotSpotter system may adhere to the requirements of the best available science. But without a more searching examination of ShotSpotter's methods under *Daubert*, we cannot conclude that this evidence was properly admitted against Godinez. After giving due deference to the district court's consideration of the record, we conclude that it abused its discretion in admitting Greene's testimony and the ShotSpotter evidence.

## III

In addition to his evidentiary arguments, Godinez contends that insufficient evidence was presented to convict him of forcibly assaulting a federal officer while using a deadly weapon and of discharging a firearm during a crime of violence. We review de novo a district court's denial of a motion for a judgment of acquittal for insufficient evidence. *Wallace*, 991 F.3d at 812. In doing so, we construe the evidence in the light most favorable to the government, and we affirm a jury's verdict if any rational trier of fact could have found the offense's elements satisfied beyond a reasonable doubt. *Id*.; *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

To succeed on a claim of insufficient evidence at trial, a convicted defendant must clear what this court has consistently characterized as a high bar. *See United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014) ("nearly insurmountable hurdle"); *United States v. Griffin*, 684 F.3d 691, 694 (7th Cir. 2012) ("a heavy burden" (internal quotation marks omitted)); *United States v. McCaffrey*, 181 F.3d 854, 856 (7th Cir. 1999) ("a daunting task"). "We will reverse a conviction only where the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Khan*, 937 F.3d 1042, 1055 (7th Cir. 2019) (citing *United*

*States v. Heon Seok Lee*, 937 F.3d 797, 807–08 (7th Cir. 2019)). And because we afford great deference to a jury's verdict of conviction, *Khan*, 937 F.3d at 1055, that deference to the jury's deliberations prevents us from assessing the quality of the evidence. *See, e.g., United States v. Smallwood*, 188 F.3d 905, 914 (7th Cir. 1999). In other words, we respect "the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences." *United States v. Reed*, 875 F.2d 107, 111 (7th Cir. 1989) (internal quotation marks omitted).

On this argument, we review the entirety of the trial record without the ShotSpotter evidence and Greene's testimony. As for the remaining evidence, some of it is circumstantial. But an implication that circumstantial evidence is weaker than direct evidence is incorrect. *See Murrell v. Frank*, 332 F.3d 1102, 1117 (7th Cir. 2003) ("Circumstantial evidence is of equal probative value to direct evidence and in some cases is even more reliable." (internal quotation marks omitted)); *United States v. Moore*, 115 F.3d 1348, 1364 (7th Cir. 1997) (noting much the same). We note that the district court here correctly instructed the jury, under the Pattern Criminal Jury Instructions of the Seventh Circuit No. 2.03 (2012 ed.), that "[t]he law does not say that one is better than the other."

For the crimes he faced, only one element was in dispute at trial: was Godinez the person who shot Crump? Based on the location of the shots, Godinez's whereabouts during the shooting, his motive, and his actions after the shooting, sufficient evidence supported the jury's decision that Godinez shot Crump.

*The location from where the shots were fired.* From the gangway between 4332 and 4336 South Hermitage Avenue,

Presnell recovered five shiny casings. ATF expert Esposito testified that all five casings had been ejected from the same 9mm caliber gun, and that a recovered bullet was fired from what was most likely a 9mm caliber gun. The parties stipulated that this recovered bullet contained Crump's DNA. Godinez objects to this ballistics evidence, as he did at trial. But as discussed, the district court did not err in admitting that evidence. The jury could properly draw a straight line from the gangway—which the videos show Godinez entering before and exiting after the shooting, and in which the casings were recovered—to the tree where one of the bullets was recovered and the grass where the second bullet was found. From this evidence, a rational jury could find that the casings and bullets were fired from the same gun and by a person shooting from the gangway. Godinez's speculation that the casings and bullets came from other shootings cannot overcome the jury's permissible inference on this point.

At trial, Winter and Spratte—who were near Crump when he was shot—also corroborated the location from where the shots were fired. Winter testified the shots were fired from northwest of the agents' location, which was near the gangway. And Spratte, who returned fire, testified to the location of the muzzle flares (halfway up the 4300 block of South Hermitage Avenue on the west side of the sidewalk) as by the gangway. Nevertheless, no video directly captures the shots being fired. The government maintained at trial that an awning blocked the camera from capturing the firing of the gun. Godinez responds that the muzzle flashes still should have been visible, especially in the dark after 3 a.m. But even if the flashes were not seen on video, Spratte testified he saw them come from the same area of Hermitage as the gangway.

Whether to favor Godinez's theory or Spratte's testimony is a decision for the jury.

*Godinez's whereabouts during the shooting.* Godinez's then-girlfriend, Jean-Baptiste, identified him in the video presented to the jury, and Godinez does not contest that he is depicted. Video shows him dressed in dark clothing and moving from where he lived on South Wood Street across the alley into the gangway. After the shooting, Godinez is shown running back across the alley with his hand stationary at his right side moving at a faster pace, for example, than he is depicted later in video taken at the gas station he and Jean-Baptiste visit. Viewing the evidence in the light most favorable to the government, a rational jury could have found that video places Godinez where the shots were fired at the time they were fired. Our dissenting colleague writes that we "oversimplify the facts when [we] assert that the jury could have drawn a straight line 'from the gangway' point where Godinez entered and exited, and the spot where the bullet casings were recovered, to the area on S. Hermitage where the bullets themselves were found." Post at 28–29. Rather, the evidence, taken as a whole, permits the jury to reach the conclusion that Godinez was at that location when the shooting occurred.

Against all this, Godinez offers an alternative explanation of who shot Crump—the same one he offered at trial. Spratte told Evans that he saw muzzle flashes and someone wearing a white t-shirt down the street. On appeal, Godinez again asserts the person wearing a white t-shirt was the shooter. Godinez argues he could not have been the shooter because at the time of the shooting—as the video shows—he was wearing a black shirt, and he did not wear a white t-shirt until

he bought one at the second gas station that he and Jean-Baptiste visited sometime after the shooting.

But at trial, Spratte did not identify the person in the white t-shirt as the shooter. Instead, Spratte testified he did not recall when he saw the person in the white t-shirt in relation to the shots being fired, and he did not see the person in white behind the muzzle flashes. Moreover, video shows a person in a white t-shirt appearing in a different location than the gangway—at the south end of the alley between Wood and Hermitage—26 minutes *before* the shooting, as Jacobsen testified. So a rational jury could reject Godinez's theory of the mystery shooter in a white t-shirt. By this argument, Godinez asks us to assess the evidence and to resolve this possible evidentiary conflict, a task beyond our appellate role. *See Smallwood*, 188 F.3d at 914.

*Motive*. Ruiz testified that Godinez, as a Latin Saint, was required to patrol the gang's territory and to shoot at rival gang members who entered that territory. At trial, Godinez took the position that he was not part of protecting the gang's turf. But video from the minutes leading up to the shooting shows Godinez slowly driving around the neighborhood, as if patrolling. Noticing a slow-moving, unfamiliar car (which contained the agents), Godinez next entered and quickly exited his house (presumably to get a gun). He then ran to the gangway opening onto Hermitage, fired shots, and ran back home. Mistaking the agents for rival gang members fits with Godinez's actions before, during, and after the shooting.

In addition, Jean-Baptiste testified that Godinez sent her a Snapchat message shortly after the shooting asking her to pick him up. And after getting in Jean-Baptiste's car, Godinez said, "I feel good. F*** that flake." According to Ruiz's

testimony, a "flake" means a rival gang member. The jury could reasonably interpret this statement as Godinez thinking he had shot at a rival gang member. Still, Godinez argues that Jean-Baptiste testified at trial only that he said, "'I feel good, f***' and something about 'flake.'" But when pressed, Jean-Baptiste testified that Godinez said something like "f*** that flake" or "f*** those flakes." To the extent Jean-Baptiste back-tracked at trial, the government impeached her using her grand jury testimony. Again, what account to credit on this score is a determination for the fact finder, here the jury.

*Godinez's actions after the shooting.* Godinez and Jean-Baptiste drove to a gas station after the shooting, on the way downloading a police scanner cell phone application to monitor law enforcement in the neighborhood. True, they may have wanted to know what was going on there. But a rational jury could also infer that Godinez—aware that law enforcement officers had flooded the Back of the Yards and established two perimeters around the crime scene—wanted to avoid questioning or capture. From Godinez later leaving his car and phone at a cousin's house, a rational jury similarly could infer that he wanted to keep a low profile. At a second gas station, Godinez bought a white t-shirt, which he put on over the black shirt he wore during the shooting, allowing a rational jury to infer that he wished to change his appearance. And from Godinez's reaction to Rodriguez's expression of emotion, a rational jury could also conclude Godinez regretted his actions, including the shooting. Viewed in the light most favorable to the government, this evidence of what Godinez did after the shooting could allow a rational jury to find that Godinez shot Crump.

Based on the ample and intersecting evidence presented during the six-day trial, a rational jury could conclude beyond a reasonable doubt that Godinez shot Crump. Our dissenting colleague disagrees, offering competing inferences from the evidence at each step. The jury could have reached those inferences, but it did not. And even if no single inculpatory fact proves guilt, the complementary nature of the evidence as a whole permitted a reasonable jury to find Godinez guilty. Because Godinez has not shown that the government submitted no evidence for a rational trier of fact to find him guilty beyond a reasonable doubt, we must defer to the jury's verdict on both counts. *See Jackson*, 443 U.S. at 319; *Khan*, 937 F.3d at 1055.

On a final note, Godinez and the government disagree as to whether the admission of the ShotSpotter evidence and Greene's related expert testimony was harmless error. Federal Rule of Criminal Procedure 52(a) states "[a]ny error … that does not affect substantial rights must be disregarded." We have concluded that it was erroneous to admit that evidence and related testimony without a *Daubert* hearing, so the burden rests on the government to show that the error was harmless. *See United States v. Olano*, 507 U.S. 725, 741 (1993). "The test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded." *United States v. Curtis*, 781 F.3d 904, 911 (7th Cir. 2015). "We will affirm if 'the error had no substantial influence on the verdict' because 'other untainted incriminating evidence is overwhelming.'" *United States v. Chaparro*, 956 F.3d 462, 482 (7th Cir. 2020) (quoting *United States v. Zuniga*, 767 F.3d 712, 717 (7th Cir. 2014)). So "[e]ssentially, an evidentiary error is harmless if it did not have a substantial influence on the

verdict." *United States v. Pulliam*, 973 F.3d 775, 782 (7th Cir. 2020), *as amended* (Sept. 8, 2020).

The government has met its burden here. The ShotSpotter evidence was cumulative of other evidence presented at trial as to the location of the shots:

- Spratte observed where the shots came from and the muzzle flashes;

- Winter saw the shots came from the northwest;

- the casings were found in the gangway between 4332 and 4336 South Hermitage Avenue;

- the plat map showed that the gangway where the casings were recovered was north and west of the agents; and

- a straight line could be drawn from the gangway to where the bullets were found and Crump was shot.

So ShotSpotter was not the only evidence pointing to the location from where the shots were fired. Godinez argues that the ShotSpotter evidence—mentioned in the government's closing argument—"filled [in the] holes" of the circumstantial case presented against him. But that contention misunderstands that circumstantial evidence is evidence all the same. *See Murrell*, 332 F.3d at 1117; *Moore*, 115 F.3d at 1364. Parsing circumstantial evidence from direct evidence reweighs, rather than reviews, that evidence. As the Pattern Criminal Jury Instructions of the Seventh Circuit No. 2.03 (2012 ed.) states, "[i]t is up to [the jury] to decide how much weight to give to any evidence, whether direct or circumstantial."

Given the aggregate evidence about the location of the shots, the government's case against Godinez was not

significantly less persuasive without the ShotSpotter evidence. And looking beyond the shooting location evidence only confirms our conclusion. The rest of the evidence against Godinez—his whereabouts at the time of shooting confirmed by video and Snapchat records, his motive, and his actions before and after the shooting—was overwhelming. Based on all of this, the ShotSpotter evidence did not have a substantial influence on the verdicts, rendering its admission harmless.

## IV

For these reasons, Godinez's convictions are AFFIRMED.

WOOD, *Circuit Judge,* dissenting. Kevin Crump, a federal agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), was shot in the head while conducting a late-night field operation in Chicago at around 3:18 am on May 4, 2018. Fortunately, despite his catastrophic injury Agent Crump survived. He later testified in the trial against his alleged assailant, Ernesto Godinez, a longtime resident of the neighborhood where the shooting took place.

At first glance, it may seem that there was no shortage of evidence against Godinez. But, as I detail below, a closer look at the record shows that the government failed to connect the dots between isolated pieces of information, and in the end, it failed to present sufficient evidence to permit a jury to decide, beyond a reasonable doubt, that Godinez was the shooter.

The government's theory was that Godinez stood at the entrance of a gangway between 4332 and 4336 S. Hermitage Avenue and fired several rounds southward, toward the ATF agents who stood at the intersection of W. 44th St. and S. Hermitage. (A "gangway" is a narrow alley between two buildings with an entrance on the front street and an exit onto a rear alley). After a six-day trial, a jury found Godinez guilty of assaulting a federal officer with a deadly weapon and using a gun to commit a violent felony. In a post-trial motion for acquittal, FED. R. CRIM. P. 29, Godinez insisted that the evidence did not prove his guilt beyond a reasonable doubt. My colleagues, however, are satisfied that the evidence squeaked by the deferential standard that applies to review of jury verdicts, and so they affirm the district court's denial of Godinez's motion for acquittal and hold that he was properly convicted.

Although I recognize that it is rarely error to affirm a jury's verdict, I believe that this case is the exception that proves the rule. Even viewing the evidence in the light most favorable to the government as required by *Jackson v. Virginia*, I would hold that no rational trier of fact could convict Godinez beyond a reasonable doubt. 443 U.S. 307, 319 (1979). See also *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (applying *Jackson* standard to a direct criminal appeal). At best, the government presented a case *consistent* with Godinez's being the gunman, but no evidence (if believed) was enough to push the ball over the mid-field mark, much less to prove guilt beyond a reasonable doubt. Accordingly, I respectfully dissent.

## I

The rule in *Jackson v. Virginia* guides the inquiry for Rule 29 motions for acquittal. 443 U.S. 307; *United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014). Under this rule, we view the evidence in the light most favorable to the government and "defer to the credibility determination[s] of the jury." *United States v. Blassingame*, 197 F.3d 271, 284 (7th Cir. 1999). We may "overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Id*. While few criminal defendants surmount the hurdle presented by *Jackson*, relief is not unheard of. See, *e.g.*, *Smith v. Brookhart*, 996 F.3d 402 (7th Cir. 2021) (granting relief in the habeas corpus context, which if anything is even more deferential to the trial outcome).

### A. The Evidence Against Godinez

The government presented ample evidence to establish that *someone* located in the entrance of the gangway between

4331 and 4336 S. Hermitage Ave fired the gunshots. Aside from the ShotSpotter testimony which the majority thoroughly discusses, there is the following evidence in the record: (1) five bullet casings recovered at the mouth of the gangway, (2) eyewitness testimony from ATF agents describing muzzle flashes in the direction of the gangway, and (3) bullets lodged in various locations, whose reconstructed trajectories suggest that they were fired from the gangway. This is enough for any rational trier of fact to conclude that whoever shot Agent Crump did so from the entrance of the gangway. But nothing in that evidence was enough to identify the shooter.

The evidence did show that Godinez was in the general area at the time the shooting took place. But there was nothing necessarily incriminating about that fact. He lived just north of the intersection of W. 44th Street and S. Wood Street. His home was just one block west of the intersection where Agent Crump was shot. Tr. 629–30. Real-time geolocation data from his Snapchat account (a social media application) confirm that at 3:18 am he was within 100 meters (about 110 yards—more than a football field) of the shooting at 3:18 am. Security footage visually confirms his presence near 44th and Wood before the shooting. And a security camera in the alley between S. Wood Street and S. Hermitage Avenue also captures Godinez crossing the north-south alley before the shooting (heading westward towards Hermitage) and crossing back after the shooting (heading eastward towards Wood). On his return trip, he seems to run across the alley with his right hand stationary at his hip.

My colleagues oversimply the facts when they assert that the jury could have drawn a straight line "from the gangway"

point where Godinez entered and exited, and the spot where the bullet casings were recovered, to the area on S. Hermitage where the bullets themselves were found. *Ante* at 19. As they acknowledge, the place where Godinez entered and exited the gangway is not the same as the place where the bullet casings were recovered. In fact, these two locations are separated by a 100-foot distance along an *east-west* axis, and the spent bullets were found directly *south* of where the casings were recovered. How can one draw a "straight line" among these three points? By referring to "the gangway" in generalized terms, my colleagues gloss over the spatial details of the evidence to derive a single, fixed point in space at which (1) Godinez is observed, and (2) bullet casings are found. But it is precisely the separation of these two points that is at issue.

In fact, nothing directly places Godinez at the place where the casings were found—not film, not physical evidence, not testimony. Throughout this time the gangway was shrouded in darkness, outside the range of the many security cameras in the area. Nothing, in short, placed Godinez at the shooter's location at the critical time. Something more was needed before the jury could infer that he was that shooter.

To close the evidentiary gap, the government presented what my colleagues refer to as Godinez's "motive" and his "actions after the shooting." Hector Ruiz, a gang member turned informant, testified at trial that the Latin Saints street gang controlled the Back of the Yards neighborhood where the shooting took place. Members of the gang, according to Ruiz, are responsible for keeping rival gang members out of the neighborhood by "[c]has[ing] them or shoot[ing] at them" when spotted. Tr. 729. Ruiz described Godinez as a "chief" in the street gang, subject to the duties of all other members. Tr.

723. (Although Ruiz declined to name Godinez a "chief" in his grand jury testimony and in discussions with federal investigators, Tr. 748, 753, I assume that the jury considered Ruiz's trial testimony as the truthful account.)

Before the shooting, security footage captured Godinez slowly driving around the Back of the Yards in his white Kia SUV. (The majority describes this as "patrolling.") At one point before the shooting, Godinez entered and left his home. ("[P]resumably," the majority guesses, "to get a gun," though there is no evidence either that this was his motive or that he retrieved any gun while he was there.) Five minutes or so after the shooting, Godinez was picked up in front of his house on S. Wood Street by his then-girlfriend, Valerie Jean-Baptiste. He commented to her that he "[felt] good." He also said "fuck" that (or those) "flake[s]"—a term used to refer to rival gang members, though nothing indicates whether this was simply a general sentiment or if something particular prompted it.

Jean-Baptiste and Godinez then proceeded to a gas station. En route, Godinez downloaded a smartphone application that picks up police chatter. At the gas station, Godinez purchased a white t-shirt and layered it on top of his black t-shirt. Security footage captured Godinez in the gas station around 3:33 am.

Shortly after 4:40 am, Godinez returned to the neighborhood and got back into his white Kia SUV. Jean-Baptiste and he drove to O'Hare International Airport to drop off a friend. Instead of driving straight back home, however, Godinez stopped by his cousins' home (in a different neighborhood) and traded his white Kia for his cousin's gray SUV. He returned to the Back of the Yards that morning, driving the gray

SUV and wearing the same clothes he had worn for hours. Dkt. 99 at 10. Around noon, Godinez picked up the mother of his child, Destiny Rodriguez, and their child, near W. 43rd St. and S. Honore St., two blocks away from the shooting.

In the evening of May 4, Godinez returned to his cousin's house, this time with Rodriguez and his baby. There, they all learned that he was wanted by police. Rodriguez began crying. Godinez hugged her and apologized for anything he had done to hurt her. Tr. 685. Godinez then left "one of his phones" and his white Kia SUV at his cousin's home, and later arranged for his surrender. Dkt. 99 at 11; Tr. 708.

In my colleagues' view, these facts gave the jury enough to infer that Godinez was the shooter. If he was duty-bound to shoot rival gang members, they suggest, then it is conceivable that he mistook the ATF agents for a rival gang and took the steps needed to drive them from the neighborhood. When entering Jean-Baptiste's car, his comment "I feel good, fuck that flake" might have been a way of saying that he was satisfied with what had just happened nearby (whatever that was—nothing indicates that the shooting was the only conceivable event). My colleagues believe this is enough to permit the jury to infer that Godinez pulled the trigger. Further, they believe that Godinez's act of downloading a police scanner, layering up with a different colored t-shirt, and trading his white Kia for a gray SUV permitted the jury to infer that he was trying to avoid capture. Finally, they reason that Godinez's apology to Rodriguez would permit a jury to infer that he was expressing remorse for shooting a federal agent. But each of these leaps goes too far.

### B. Gaps in Evidence

If the only evidence against Godinez were his supposed motive or actions after the shooting, Godinez would likely have walked away a free man. Let's start with motive. Our court recognizes that when "evidence of gang membership [is] necessary to explain the motive behind the crime charged," *United States v. Montgomery*, 390 F.3d 1013, 1018 (7th Cir. 2004), the jury may rely on evidence of gang affiliation to establish the requisite motive. But the jury still needs a basis for concluding that the putative gang member actually committed the crime. Mere gang membership does not suffice, lest police receive *carte blanche* authority to round up every suspected gang member in hopes that the jury will conclude that at least one of them must have been near the alleged crime site and thus was guilty. At best, Ruiz's testimony characterizing Godinez as a "chief" in the Latin Saints gang permitted the jury to draw the inference that Godinez *had a reason* to shoot Agent Crump (mistaking him for a rival gang member). But motive alone provides no basis for inferring that Godinez performed any particular act.

Another piece of evidence that my colleagues find damning is Godinez's act of driving slowly around the neighborhood before the shooting. They characterize this as "patrolling," again, with no supportive evidence. Even more speculative is their view of Godinez's actions after he spotted an unknown vehicle. He stopped off briefly at his house. From that simple act, they surmise that he retrieved a gun from his home. But there was no gun: there was no proof that a gun was in the house; there was no proof that anyone in the house had a gun and gave it to Godinez; and there was no proof that Godinez had a gun after he left the house. I cannot accept the

proposition that proof of gun possession is complete simply by showing that a person entered and left his own home, period. Too many other reasons easily explain that brief stop: Godinez may have needed to use the restroom, grab a cellphone, or drink some water; the possibilities are endless. There is no basis for the inference that Godinez obtained a gun during that stop. Inferences are based on fact, not speculation, and all we can do with the knowledge that Godinez enters his home out of sight of security cameras is speculate on what he did inside.

Five minutes after the shooting, Godinez said "I feel good, fuck that flake." Are these the words of a gunman? Perhaps. But they could also be the words of a gang member who heard gunfire nearby, walked away from the area unscathed, and assumed that a rival gang member had been shot. The supposed "motive" evidence presents, at best, a case just as consistent with Godinez's guilt as with his innocence. That's not enough.

What about Godinez's actions after the 3:18 am shooting? He downloaded a police scanner app, a decision that my colleagues believe support the inference that he "wanted to avoid questioning or capture." But how is this any different from flipping to the local news or turning to Twitter to learn what had happened nearby? Again, an act that is equally consistent with criminal culpability (*e.g.*, a desire to stay one step ahead of the police by tuning into their public broadcasts) and with a variety of innocent reasons cannot support a conviction. This is not a question of weight or credibility; it is a question about whether the factual prerequisites are in place to support the inference that my colleagues believe the jury drew.

Godinez then "changes his appearance," when he layered the white t-shirt on top of his black t-shirt. They see this as a sinister move designed to evade capture. In my view, it is too weak a reed to support the jury's verdict. What really changed? Godinez still had the discernable long hair under a cap, dark colored shorts, and the same black t-shirt underneath. Particularly in his own neighborhood, which he did not try to avoid, slipping on a white t-shirt means little. The Old Farmer's Almanac reports that the temperature that night went down to 58 degrees Fahrenheit, that there was light precipitation, and that the wind ranged from 17 mph to gusts of 41 mph. See https://www.almanac.com/weather/history/IL/Chicago/2018-05-04. For all we know, Godinez thought he would be more comfortable with another layer. While I am no expert in the art of disguise, I would expect more from a shooter attempting to avoid detection.

My colleagues then suggest that "[f]rom Godinez later leaving his car and phone at a cousin's house, a rational jury similarly could infer that he wanted to stay away from the neighborhood." But that makes no sense. In the first place, after trading his white Kia for his cousin's gray SUV, he drove right *back* into the neighborhood wearing the same clothes he had worn hours before. No rational jury could conclude that Godinez wanted to do the exact opposite (leave) of what he actually did (return to the neighborhood several times in the hours after the shooting). My colleagues then misread the facts pertaining to Godinez's phone. Godinez visited his cousin's house twice—once to drop off his Kia, and later to return with Rodriguez. It was after the second visit, during which he learned that he was wanted by police, that Godinez "abandoned *one* of his cellphones" at his cousin's house. Dkt.

99 at 11 (emphasis added). Presumably he still had the other phone.

My colleagues make another leap: that "from Godinez's reaction to Rodriguez's expression of emotion [after finding out that he was wanted by police], a rational jury could also conclude Godinez regretted his actions, including the shooting." But Rodriquez's testimony does not leave the door open for this theory. When Godinez hugged Rodriguez, "he was just saying [to her], 'I love you' and was saying that he was sorry for everything that he's ever done to [her] and ever hurt [her]." Tr. 685. Maybe a generalized expression of remorse (such as "I'm sorry for everything") might permitted the inference suggested by my colleagues, but that is not what Godinez said. Instead, he specifically included the entire course of their relationship, and in so doing, left no room for the inference my colleagues believe the jury could draw.

Last, I must address the evidence that might have swayed the jury to convict Godinez. The government's key exhibit, labeled GX106, contains the footage from the security camera in the alley between S. Wood Street and S. Hermitage Avenue. In this video, Godinez is seen walking westbound from the Wood Street side of the alley to the Hermitage Avenue side. The time was 3:16:69 am, minutes before the shooting. (The still image below is timestamped 3:19:47 am, which would be after the shooting if the camera's internal clock were accurate. At trial, however, the government's expert clarified that the alley camera's internal clock ran 2 minutes and 47 seconds ahead). After the shooting, at 3:18:27 am, the alley camera captures Godinez heading eastbound back towards Wood Street. (That still image is timestamped at 3:21:15 am).



   As my colleagues describe it, the image on the right shows Godinez "running back across the alley with his hand stationary at his right side moving at a faster pace" than usual. Of course, there is nothing inherently suspicious about a person's running away from gunfire; failing to stand in place when the bullets start flying is not a prerequisite for innocence. And while holding one's hand stationary while all else is in motion might indicate that the person was holding something (in this case, the majority speculates, a gun), Godinez's arm positioning loses its significance when we consider his depiction in GX104, which contains footage from a gas station recorded approximately 15 minutes after Agent Crump was shot. Godinez is seeing walking in with his right-hand stationary at his side, holding what seems to be a cell phone.



Thus, neither Godinez's speed nor his posture indicates guilt. Nonetheless, my colleagues are willing to say that "a rational jury could have found that video places Godinez where the shots were fired and at the time they were fired." But it does no such thing; it does not even place him within a short distance of the place where the shots were fired. All it does is indicate that he may have been nearby. Anything further is nothing but speculation.

In GX106, Godinez is seen entering and exiting a gangway from which, at the gangway's entrance on Hermitage (100 feet west from where Godinez is filmed), a person fired several shots towards federal agents. But walking toward a destination is not the same as arriving. Nothing in the government's videos depicts Godinez arriving at the gangway's entrance on S. Hermitage Avenue. At most, they show Godinez on a trajectory consistent with arriving at the destination from which the gunshots were fired. But the remainder of the 100-foot journey remains unobserved:



Above, I highlight Godinez's observed crossing in the alley with a yellow triangle, and I denote the unobserved mouth of the gangway with a red circle. The only way to close the gap between these two points is through speculation that Godinez continued on a straight-line path. True, "a body in motion will remain in motion unless it is acted upon by an external force." Isaac Newton, *Philosophiæ Naturalis Principia Mathematica* (1687). But we can take judicial notice of the fact that human beings have independent agency. People stop. People hesitate. People turn around, or change their minds. And sometimes, people run. There was not enough in the record in this case for the jury to place Godinez at the mouth of the gangway at the critical moment beyond a reasonable doubt.

I would accordingly reverse the denial of Godinez's motion for acquittal, and I respectfully dissent from the decision to affirm.