2022 IL App (2d) 210283-U
No. 2-21-0283
Order filed May 5, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-CF-1667 |
| | ) | |
| JAMES L. WARREN, | ) | Honorable |
| | ) | Phillip G. Montgomery |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  There was sufficient evidence that defendant's statements amounted to a true threat to a public official and were not protected speech under the First Amendment; affirmed.

¶ 2    We consider in this case whether defendant's statements constituted a "true threat" to a public official, namely the judge presiding over defendant's divorce case. We determine that they did.

¶ 3                                I. BACKGROUND

¶ 4　　The facts in this case are essentially undisputed. In August 2018, the State charged defendant, James L. "Jamie" Warren, with one count of threatening a public official (720 ILCS 5/12-9(a)(1) (West 2018)) between June 26, 2018, and August 15, 2018. The victim of the threat was the circuit court judge presiding over defendant's divorce case, the Honorable Rene Cruz. After defendant was charged, the judges of the Sixteenth Judicial Circuit were recused and the Illinois Supreme Court transferred the case to the Honorable Phillip G. Montgomery of the Twenty Third Judicial Circuit. Thereafter, a bench trial was held.

¶ 5　　As part of opening statements, the State set forth defendant's statements about Judge Cruz. The defense stated that it did not dispute whether defendant made the alleged statements; rather, according to defense, "the issue" was that defendant's statements simply "were not threats."

¶ 6　　Judge Cruz testified that he was the current Presiding Judge of the Family Division and had been assigned to that division ever since he was appointed as an associate judge in 2012. Beginning in 2016, Judge Cruz began hearing the case of Warren v. Warren, No. 16-D-823 (Cir. Ct. Kane County), which involved defendant's divorce from his former wife, Trisha. The parties have four children.

¶ 7　　Judge Cruz entered a dissolution judgment in late 2017, but through the spring and summer of 2018 some unresolved child support matters persisted and a rule to show cause was pending against defendant. On August 14, 2018, Judge Cruz was called upstairs to the office of Judge Kevin Busch, then the presiding judge of the division, and it was disclosed that defendant had made several statements threatening Judge Cruz. Specifically, defendant sent several text messages to Trisha the day before. She took a screenshot of the texts, which her attorney then brought to Judge Busch's attention. Judge Cruz was only given "the gist" of the text messages at the time, but later learned of their exact content.

¶ 8     Judge Cruz began to look through social media, including Facebook, to see if he could find a picture of defendant to show to his family. Judge Cruz did not need a picture personally however; he knew what defendant looked like and where defendant lived. Judge Cruz explained that he knew where defendant lived because defendant was staying at his parent's home and they lived on the same street in Aurora. The street was a cul-de-sac, so Judge Cruz had to pass defendant's parent's house every day to go to work and to get home.[1]

¶ 9     Judge Cruz was able to find defendant's profile page on Facebook. Judge Cruz knew it was defendant's page because defendant had a picture of himself as his profile picture.

¶ 10     That evening, Judge Cruz showed a picture of defendant to his family and warned them. He also began to read through defendant's posts on Facebook, when he discovered the following:



One of the commenters asked defendant why his child support had increased, and defendant responded, "The judge is an asshole. He thinks he's untouchable. Hes gonna find out differently. #renecruz #corruptcruz"

---

[1] As a condition of his bond, defendant was required to obtain a psychological evaluation, to surrender his FOID card and firearms, and to reside elsewhere.

¶ 11    Judge Cruz testified that "gat" is slang for a gun and that a "187" is a common term for murder or homicide. Thus, Judge Cruz interpreted the post as indicating defendant wanted to murder him by sticking a gun in his mouth and pulling the trigger.

¶ 12    Judge Cruz discovered another of defendant's posts from two days later, on June 28, 2018, which read:



Judge Cruz testified that he felt defendant's statement about "need[ing] his ass handed to him" constituted a threat of physical violence.

¶ 13    Judge Cruz came across another post from July 24, 2018. This post contained an image:



Judge Cruz was unable to identify the "angry little creature" appended to defendant's post.[2] However, Judge Cruz noted that the timestamp, 8:09 p.m., was approximately when he would have passed by defendant's parent's house that night on his way to play soccer.

¶ 14 As noted above, Judge Busch later showed Judge Cruz a copy of the text messages defendant sent to Trisha on August 13, 2018. They read:



¶ 15 On August 15, 2018, defendant posted on Facebook that he had been contacted by sheriff's deputies over his statements about Judge Cruz. Defendant stated that he was not arrested, and a friend wrote, "Good deal!!!" Then, defendant stated, "Thought I'd have to call in a 'ma deuce' alert." Judge Cruz testified that he came from "a military family," and knew that a " 'ma deuce' " was slang for "a Browning rifle."[3]

---

[2] It is the character "Anger" from Disney/Pixar's 2015 film *Inside Out*, voiced by Lewis Black.

[3] More precisely, it is a reference for the "M2 Browning," a .50 caliber belt-fed machine gun. The nickname "ma' deuce" comes from the nomenclature, "M2." (https://en.wikipedia.org/wiki/M2_Browning) (Mar. 24, 2022).

¶ 16    These statements caused Judge Cruz to fear for his family's safety as well as his own safety. Judge Cruz also noted that "it seemed like [defendant's] behavior was escalating leading up to the [parties' August 15, 2018] court date." As a result, on August 15, 2018, Judge Cruz recused from hearing the Warrens' dissolution case any further and it was reassigned.

¶ 17    On cross-examination, Judge Cruz testified that defendant had never threatened him in court; however, Judge Cruz nevertheless believed defendant's Facebook posts and text messages threatened him with physical violence. Judge Cruz acknowledged that he also saw posts from defendant indicating that he would lodge a complaint about Judge Cruz with the presiding judge of the family division and with the Judicial Inquiry Board (JIB). However, to the best of his knowledge, Judge Cruz testified that defendant never filed a complaint.

¶ 18    In addition to Judge Cruz, attorney Warren Sylvester testified that he represented Trisha in her divorce from defendant. In July 2018, Sylvester received a copy of an e-mail exchange forwarded to him by Trisha, which read as follows:

"From: [Trisha's email]

Date: 7/14/18 9:47 PM

To: [Defendant's email]

Subject: Re: Kids this week

We'll see what the judge says on the 24th."

The email indicates Trisha sent it from her iPhone. At 11:49 p.m., defendant replied:

"Lol. I don't give a fuck what he says

He should worry about other things. Like his family… their health and welfare."

¶ 19    Upon receiving the emails from Trisha, Sylvester contacted defendant's divorce attorney, Jim Jensen, about the emails. Jensen indicated that he would speak with this client. When Trisha

sent Sylvester a copy of defendant's text messages on August 14, 2018, however, Sylvester brought both communications to Judge Busch to warn Judge Cruz. (Jensen subsequently withdrew from representing defendant.)

¶ 20    On cross-examination, Sylvester conceded that it was fair to call the Warren's divorce case "contentious." Sylvester also explained that Judge Cruz never increased the rate for defendant's child support; rather, the payment amount was increased due to defendant's arrearage and his failure to comply with the prior support order.

¶ 21    Kane County Sheriff's Deputy Sergeant Steve Bruening testified that he performed a forensic extraction of the data on Trisha's iPhone and authenticated the records he received. Another deputy, Lieutenant David Wolf, spoke with Judge Cruz and investigated defendant's Facebook page. Wolf was able to view defendant's Facebook page without any restrictions; he could, "see all of his posts." Wolf had a subpoena issued to Facebook for defendant's posts and authenticated the screenshots and records he received. Wolf testified that he reviewed over 4,000 posts from defendant. Wolf stated that he took defendant's threats very seriously because defendant, at the time, lived so close to Judge Cruz.

¶ 22    Trisha testified that defendant moved in with his parents when she and defendant separated in April 2016. She provided defendant's texts and emails to her attorney and cooperated with the county sheriff's investigation. Trisha also testified that defendant's Facebook account was visible to the public, but that he had blocked her so she could not see his posts.

¶ 23    Trisha testified that defendant served in the Army and that, to the best of her knowledge, defendant owned several firearms which he stored in a safe in the garage at his parent's house until he was arrested in this case. The State rested.

¶ 24    Defendant testified that he was the author of the Facebook posts in question; however, he believed his privacy settings were "friends only" so that the general public could not have access to his posts. Defendant learned that the public could in fact see his posts. Defendant stated that he never contacted Judge Cruz personally and that he had blocked Trisha from viewing his Facebook account.

¶ 25    Defendant testified that he did not currently own any firearms but stated that his father did. The guns were kept in his father's safe and defendant stated that he did not have access to them.

¶ 26    When asked about the June 26, 2018, post, defendant stated that he was "upset about the increase in support and *** thought [he] was venting to [his] friends." According to defendant,

> "I thought it was a little on the funny side because I thought it was a ridiculous amount. That's why I put the laughing emo[j]is and the comment with the 187.
>
> As a 40-year-old construction worker in the suburbs, that was meant for my Army buddies from when we were in the Army in the early '90s. That's a joke you wave around to each other."

Defendant stated that he never intended to threaten anyone and never intended for Judge Cruz to see his post.

¶ 27    Defendant also explained that when he said Judge Cruz believed himself to be "untouchable" he was merely referring to filing a JIB complaint or contacting his local representatives. According to defendant, "I got the sense that he didn't think he needed to follow the law. I thought somebody would hopefully tell him differently."

¶ 28    When asked about his text message to Trisha about making Judge Cruz's family suffer, defendant stated that he meant for Judge Cruz to suffer "[f]inancially" and in the sense of "not being able to see his kids." "That's the only way it could be meant," defendant added. As to a "ma

deuce alert," defendant testified that it was "like a broken arrow" or "sort of like you need help or backup type of thing."

¶ 29 On cross-examination, defendant stated that he asked his divorce attorney to have Judge Cruz removed from the dissolution case in 2016 because he "found out that Judge Cruz was friends with [Trisha's] boyfriend." This person was never identified, but despite that allegation and others, defendant never sought to have Judge Cruz substituted and never filed a complaint with the JIB or the presiding judge. Defendant also testified that he owned around 20 firearms in 2015, but when he learned Trisha was planning to call the police, he knew they would be confiscated, so defendant "snuck them out of the house" and gave some to his father and "sold" some to a friend.

¶ 30 When asked about each of his statements about Judge Cruz, defendant largely responded that his language was "figurative" and did not "refer to anybody." According to defendant, he never implied that he was going to murder Judge Cruz and never intended anyone beyond his circle of Facebook friends to see his posts.

¶ 31 With respect to defendant's text messages and emails to Trisha, defendant did not believe that she would show her attorney or the authorities what he had said. Defendant stated that Trisha had sent him similar messages, and he never reported her. The defense rested. After closing arguments, the trial court took the matter under advisement.

¶ 32 Before rendering its verdict, the trial court made extensive factual findings. Relevant here, the court found that defendant's testimony was not credible. The court stated, "I don't believe him when he said he thought his Facebook posts and/or settings were private." The court further stated:

"It is reasonable that it was a practical certainty that threats made against a judge on a non-private Facebook page and texts sent to an ex-spouse during a time in which post-decree issues were being addressed by the judge in question would be brought to

[the judge's] attention. The Court further finds that the defendant was not so uncommonly naive as to believe otherwise."

¶ 33    The court observed that some of defendant's statements did not amount to "true threats." For example, defendant's email to Trisha that Judge Cruz should be more concerned about his own family's health and welfare did not constitute a threat *per se*. According to the trial court:

> "Do I think that the defendant really cared about the Judge Cruz's family's health and welfare? No. But I also don't think those rise to the level of a true threat."

The court continued:

> "That being said, at least in my mind, there is no getting around the defendant's June 26 [Facebook] post. ***
>
> [I]n the Court's opinion, the defendant is saying he is going to put a gun in Judge Cruz's mouth and kill him.
>
> In this Court's opinion, this does rise to the level of a true threat."

The court then entered a judgment of conviction. We note that the court did not address defendant's text messages to Trisha from August 13, 2018.

¶ 34    Defendant filed a post-trial motion, which the court denied. Although the record does not contain a transcript from defendant's sentencing hearing, it does contain both a victim impact statement by Judge Cruz as well as a copy of a plenary order of protection that was entered against defendant in the dissolution case (and presumably submitted by the State as evidence in aggravation). The trial court sentenced defendant to 20 days' work release and 24 months' felony probation. In addition, the court ordered that defendant obtain anger management treatment. Defendant timely appealed.

¶ 35                                    II. ANALYSIS

¶ 36    On appeal, defendant argues that his June 26, 2018, Facebook post was not a true threat. Rather, defendant contends, it was protected speech under the First Amendment and the State's evidence was insufficient that defendant sought to convey that post publicly. The State responds that the post was indeed a true threat, that defendant clearly published it, and that defendant conveyed his intent to harm or coerce Judge Cruz in that post. We agree with the State.

¶ 37    In assessing the sufficiency of the evidence, we ask whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In addition, the First Amendment requires that we distinguish protected speech from true threats, which are not constitutionally protected. *Watts v. United States*, 394 U.S. 705, 708 (1969) (*per curiam*). Unlike, say, political hyperbole (see *id.*), " '[t]rue threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). "[T]he mental state requirement for communicating a true threat is satisfied if 'the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat.' " *People v. Ashley*, 2020 IL 123989, ¶ 57 (quoting *Elonis v. United States*, 575 U.S. 723, 740 (2015)). Whether a statement was made with intent or knowledge, as opposed to recklessness or negligence, is " 'the crucial element separating legal innocence from wrongful conduct.' " *Elonis*, 575 U.S. at 736 (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 73 (1994)).

¶ 38    Defendant asserts that his Facebook post was not a true threat to Judge Cruz and that he did not intend or know that Judge Cruz would see it. According to defendant, his use of emojis and the fact that he used a hashtag ("#") rather than an at ("@") (which is also known as an

asperand) meant that he was not directing his post at Judge Cruz but was merely trying "to turn his situation with Judge Cruz into a topic of conversation" with his Facebook friends. Defendant cites to several online articles as well as Facebook's quarterly report for information regarding the amount of traffic on Facebook's website to support his argument, as if to indicate that no Facebook post, with or without emojis or hashtags or asperands, should ever be taken literally.

¶ 39    As an initial matter, the State has asked us to strike defendant's citations to online articles and to Facebook's quarterly report as that information was not part of the record and was never presented to the trial court. We took the State's motion with the case and we now grant it. We also grant the State's motion for leave to cite *People v. Kuehner*, 2022 IL App (4th) 200325, in support of the motion to strike. That said, we note that even if we were to consider the sources defendant cited, they do little to advance his position.

¶ 40    Here, defendant presents essentially the same argument that we rejected in *People v. Garcia*, 2015 IL App (2d) 131234, ¶ 9, that while he made statements *about* Judge Cruz, he did not make his statements *to* Judge Cruz. In other words, defendant asserts that he neither intended for Judge Cruz to hear of his statements nor knew that Judge Cruz was likely to learn of them. Furthermore, as noted, defendant asserts that his statements should have been taken in jest and should not have been taken seriously. We disagree.

¶ 41    Section 12-9 of the Criminal Code makes it a crime to knowingly deliver or convey a threatening communication "directly *or indirectly*, to a public official by *any* means." (Emphasis added.) 720 ILCS 5/12-9(a)(1) (West 2018). Moreover, as noted, at a minimum, a true threat must have been made knowingly. *Ashley*, 2020 IL 123989, ¶ 57 (quoting *Elonis*, 575 U.S. at 740). A person acts knowingly "when he or she is consciously aware that that result is practically certain to be caused by his conduct." 720 ILCS 5/4-5(b) (West 2018).

¶ 42    In *Garcia*, we stated as follows:

"That a person does not specifically request that a threat be passed along to the target does not preclude the possibility of circumstances existing that would nearly guarantee that the threat would be conveyed to the target. Here, the [trier of fact] could reasonably infer that it was a practical certainty that threats against a judge, made in the presence of personnel of law-enforcement agencies, would be brought to the judge's attention. Furthermore, the [trier of fact] could reasonably conclude that defendant was not so uncommonly naïve as to believe otherwise." *Garcia*, 2015 IL App (2d) 131234, ¶ 10.

*Garcia* is on all fours with the case at hand. True, defendant did not make his statements to law-enforcement officers specifically; he instead made them on a public Facebook post and in text messages and email exchanges with his ex-wife. But as the trial court noted, it was a "practical[ ] certain[ty]" that these statements would find their way to Judge Cruz, particularly given defendant's close proximity to Judge Cruz's home and family. Again, see 720 ILCS 5/4-5(b). And, whether these same statements would have constituted a threat if defendant lived on the other side of town is not the question. It is axiomatic that a criminal defendant "takes his victim as he finds him." *People v. Brackett*, 117 Ill. 2d 170, 178 (1987).

¶ 43    Although neither party mentions it, the precise phrase at issue in defendant's Facebook post ("187 wit my gat in yo mouth") is actually a lyric from the song "F*** Wit Dre Day (And Everybody's Celebrating)" as performed by Dr. Dre and Snoop Doggy Dogg on Dre's 1992 album *The Chronic*. The lyric is from the so-called clean version of the song, wherein the word "gat" is substituted in for the word "d***," the latter being less radio friendly. Yet defendant is guilty in a way Dr. Dre is not, for

"lyrics in songs that are performed for an audience or sold in recorded form are unlikely to

be interpreted as a real threat to a real person. [Citation.] Statements on social media that are pointedly directed at their victims, by contrast, are much more likely to be taken seriously. To hold otherwise would grant a license to anyone who is clever enough to dress up a real threat in the guise of rap lyrics, a parody, or something similar." *Elonis*, at 575 U.S. at 747 (Alito, J., concurring in part).

In applying that statement and that lyric, to Judge Cruz, defendant made it a *real* threat to a *real* person. Defendant did not use any sort of conditional or hypothetical language (*e.g.*, *Watts*, 394 U.S. at 706 (overturning conviction where defendant, at a public rally, stated that "*if*" he was drafted he would not "kill [his] black brothers" but "want[ed] to get in [his] sights L.B.J.")) nor did he engage in any type of symbolic expression (*e.g.*, *Black*, 538 U.S. at 359 (cross burning); *Texas v. Johnson*, 491 U.S. 397, 409-11 (1989) (flag desecration)). Defendant clearly identified Judge Cruz as his intended victim, defendant identified what he wanted to do (a "187" or homicide), and how he would achieve it (by firing his "gat" in the victim's mouth).

¶ 44 Cases also discuss the "calculated purveyance of a threat," which requires that the defendant, at a minimum, "knew the character of the communication [w]as threatening." (Internal quotation marks omitted.) *Elonis*, 575 U.S. at 739. In determining whether defendant knew he was threatening Judge Cruz or intended to threaten Judge Cruz, the trier of fact "was in the best position to observe the verbal and nonverbal cues and assign weight to each." *People v. Bona*, 2018 IL App (2d) 160581, ¶ 48. The trial court found that defendant was not so guileless as to believe his threats would go unnoticed. Further, the trial court reasonably found that defendant used his proximity to Judge Cruz as a means of harassing, intimidating, and attempting to coerce Judge Cruz in the performance of his official duties. We do *not* take that finding lightly.

"Government cannot be effective if it cannot punish people who intimidate [public officials] by threatening to hurt them or damage their property ***. The First Amendment is remotely if at all involved. A threat to break a person's knees or pulverize his automobile as punishment for [fulfilling his official duties] is a statement of intention rather than an idea or opinion and is not part of the marketplace of ideas." *United States v. Velasquez*, 772 F.2d 1348, 1357 (7th Cir. 1985).

We agree.

¶ 45    We note, too, that while the trial court found defendant guilty on the basis of his June 26, 2018, Facebook post, the court just as easily could have found defendant guilty on the basis of his text messages to Trisha about stopping Judge Cruz "permanently." *We* are not so naïve to think that defendant's statements went only as far as indicating that defendant wanted to file a JIB complaint or start a conversation about, say, opposing Judge Cruz's retention. We agree with the trial court that defendant knew the import of his words and knew or should have known that they, whether through Facebook or through Trisha, would inevitably reach Judge Cruz. And last, we observe that reviewing courts regularly affirm convictions in official-threat cases where the defendant had virtually no ability to carry out the threat at the time it was made. See, *e.g.*, *United States v. Dutcher*, 851 F.3d 757 (7th Cir. 2017). Here, defendant did.

¶ 46                                III. CONCLUSION

¶ 47    In sum, the State presented sufficient evidence to convict, and defendant's prosecution did not run afoul of the First Amendment. Accordingly, we affirm the judgment of the circuit court of Kane County.

¶ 48    Affirmed.